Argued and submitted January 16, 2013, reversed and remanded for further
action consistent with the principles expressed in this opinion
February 20, 2014

# BARKERS FIVE, LLC;
Sandy Baker; City of Tualatin; City of West Linn;
Carol Chesarek; Cherry Amabisca; Save Helvetia;
Robert Bailey; 1000 Friends of Oregon; Dave Vanasche;
Bob VanderZanden; Larry Duyck; Springville Investors, LLC;
Katherine Blumenkron; David Blumenkron;
Metropolitan Land Group; Chris Maletis; Tom Maletis;
Exit 282A Development Company, LLC; LFGC, LLC;
Elizabeth Graser-Lindsey; and Susan McKenna,
*Petitioners,*

*v.*

# LAND CONSERVATION AND
# DEVELOPMENT COMMISSION,
Metro, Washington County, Clackamas County,
Multnomah County, State of Oregon, and City of Hillsboro,
*Respondents.*

Land Conservation and Development Commission
12ACK001819; A152351

323 P3d 368

Wendie L. Kellington argued the cause for petitioners Barkers Five, LLC, and Sandy Baker. With her on the brief were Wendie L. Kellington, P.C., and Kristian Roggendorf, Matthew D. Lowe, and O'Donnell Clark & Crew LLP.

Jeffrey G. Condit argued the cause for petitioners City of Tualatin and City of West Linn. With him on the brief was Miller Nash LLP.

Michael F. Sheehan argued the cause and filed the brief for petitioners Carol Chesarek and Cherry Amabisca.

Carrie A. Richter argued the cause for petitioners Save Helvetia and Robert Bailey. With her on the brief were Edward J. Sullivan and Garvey Schubert Barer.

Mary Kyle McCurdy argued the cause and filed the brief for petitioners 1000 Friends of Oregon, Dave Vanasche, Bob VanderZanden, and Larry Duyck.

Christopher James argued the cause for petitioners Springville Investors, LLC, Katherine Blumenkron, and David Blumenkron. With him on the brief were Cameron Soran and The James Law Group, LLC.

Steven L. Pfeiffer argued the cause for petitioner Metropolitan Land Group and petitioners Chris Maletis,

Tom Maletis, Exit 282A Development Company, LLC, and LFGC, LLC. With him on the briefs were Seth J. King and Perkins Coie LLP.

Elizabeth Graser-Lindsey and Susan McKenna filed the brief *pro se*.

Patrick M. Ebbett, Assistant Attorney General, argued the cause for respondents Land Conservation and Development Commission and State of Oregon. With him on the brief were Ellen F. Rosenblum, Attorney General, and Anna M. Joyce, Solicitor General.

Roger A. Alfred argued the cause for respondent Metro. With him on the brief were Alison Kean Campbell and Office of Metro Attorney.

Alan A. Rappleyea, County Counsel, argued the cause for respondent Washington County. With him on the brief were Jacquilyn Saito-Moore, Assistant County Counsel, and Office of Washington County Counsel.

Rhett C. Tatum, Assistant County Counsel, argued the cause for respondent Clackamas County. With him on the brief was Stephen L. Madkour, County Counsel.

Jed Tomkins argued the cause for respondent Multnomah County. With him on the brief was Jenny M. Morf, County Attorney.

Christopher D. Crean argued the cause for respondent City of Hillsboro. With him on the brief were Pamela J. Beery, Chad Jacobs, and Beery, Elsner & Hammond, LLP.

Before Haselton, Chief Judge, and Sercombe, Judge, and Deits, Senior Judge.

HASELTON, C. J.

## TABLE OF CONTENTS

I.    Introduction.................................................................................. 264

II.   Statutory and Regulatory Framework ..................................... 265

    A.   Senate Bill 1011 (2007) ........................................................ 266

    B.   The Statutory Framework (ORS 195.137 - 195.145).............. 271

        1.   Process for Designation of Urban Reserves................. 271

        2.   Process for Designation of Rural Reserves.................. 273

        3.   Intergovernmental Coordination and Cooperation..... 275

        4.   LCDC Rulemaking Authority....................................... 276

    C.   The Regulatory Framework (OAR chapter 660, division 27)........................................................................................ 276

III.  Procedural History...................................................................... 282

IV.  Preliminary Contentions: "Clearing the Decks"........................ 287

V.   Unlawful in Substance Contentions: Compliance with "Amount of Land Standard" and Statewide Planning Goals ................... 288

    A.   "Amount of Land Standard" in OAR 660-027-0040(2)....... 288

    B.   Statewide Planning Goals.................................................... 288

        1.   Application of Economic Development Goal (Goal 9) .......................................................................... 288

        2.   Use of Urban Growth Report to Project Land Needs (Goals 2 and 14) .......................................................... 292

        3.   Assessment of Carrying Capacity (Goals 2, 3, 4, 5, 6, 8, 9, 10, 12, and 14) ........................ 292

VI.  Unlawful in Substance Contentions: "Consideration" and "Application" of the Reserve Factors and the Meaning and Application of the "Best Achieves Standard"............................... 293

    A.   Validity of LCDC's Legal Premises: "Consideration" and "Application" of the Reserve Factors ................................... 293

        1.   "Consideration" of "Factors" in the Manner of Goal 14 .. 295

        2.   Application of the Factors to "Areas"............................ 301

        3.   Application of the Factors to Alternative Areas within a County ........................................................................ 306

        4.   Application of Rural Reserve Factors, Urban Reserve Factors, or Both to Each Area ...................................... 308

        5.   Determination Whether to Designate an Area As Urban or Rural Reserves or to Leave It Undesignated.. 309

    B.   Validity of LCDC's Legal Premises: The "Best Achieves Standard" .......................................................................... 311

        1.   Standard Is Qualitative Not Quantitative .................. 312

2. Standard Applies to Designation "In Its Entirety" Not to Designation of Individual Properties or Areas .......................................................................... 313

3. "Best Achieves Standard" Allows for a Range of Permissible Regional Designations ........................... 314

4. Satisfaction of Standard Is Demonstrated through Findings Concerning Application of the Reserve Factors ........................................................................ 317

VII. Petitioners' Particularized Challenges ...................................... 319

A. LCDC Properly Understood That Designation Was Not a "Political" Decision ......................................................... 319

B. Washington County ............................................................ 320

1. Misapplication of Rural Reserve Factors................... 320

2. Effect of Washington County's Misapplication of the Rural Reserve Factors............................................... 333

C. Clackamas County............................................................. 334

1. Application of OAR 660-027-0060(4), aka the "Safe Harbor Provision," to Area 4J and Clackamas County's Revised Rural Reserve Findings on Remand..................................................................... 334

2. Clackamas County's Application of the Rural Reserve Factors ........................................................................ 336

D. Multnomah County ............................................................ 337

1. "Balancing" of the Factors ............................................ 337

2. Adequacy of Multnomah County's Consideration of Rural Reserve Factors Pertaining to Area 9D .......... 338

VIII. Unlawful in Substance Contentions: LCDC's Substantial Evidence Review....................................................................... 347

A. Standard of Review for Substantial Evidence ................. 347

B. LCDC's Understanding of Substantial Evidence Review.. 348

C. Petitioners' Particularized Challenges ............................. 350

1. Washington County ..................................................... 350

2. Clackamas County....................................................... 350

a. Designation of Area 4J As Rural Reserve ........... 350

b. Designation of Areas 4A to 4D As Urban Reserve................................................................. 355

c. Remaining Contentions......................................... 363

3. Multnomah County....................................................... 363

IX. Conclusion ................................................................................. 363

**HASELTON, C. J.**

## I.  INTRODUCTION

This case concerns the designation of urban and rural reserves in the Portland metropolitan area that will guide its growth until 2060.[1] Metro, in conjunction with Clackamas, Multnomah, and Washington counties, designated such reserves under a new process that had been established by the legislature in 2007, and, in June 2010, they submitted their designation to the Land Conservation and Development Commission (LCDC) for review. *See generally* ORS 197.626(1)(c), (f) (providing for LCDC review of urban and rural reserves). Ultimately, in August 2012— approximately one year after LCDC voted to acknowledge a revised submittal—LCDC issued its 156-page, single-spaced acknowledgment order.

Twenty-two petitioners—including property owners, nonprofit and citizen groups, and municipalities—seek judicial review of that order. In hundreds of pages of briefing, they raise 25 assignments of error that are predicated on a record that consists of approximately 36,000 pages.[2] Collectively, petitioners' assignments of error range from fundamental methodological issues pertaining to LCDC's understanding and application of the legal principles that govern the designation of reserves to the correctness of LCDC's substantial evidence review of Metro and the counties' designation of particular land as either urban or rural reserves. Simply stated, petitioners contend that LCDC's order is unlawful in substance because, in reviewing Metro and the counties' designation, LCDC misapplied the legal principles governing the designation of urban and rural reserves and circumscribing its review.

---

[1] "Urban reserves" are lands outside an urban growth boundary (UGB) that will provide for "[f]uture expansion over a long-term period" and "[t]he cost-effective provision of public facilities and services within the area when the lands are included within the [UGB]." ORS 195.137(2). Conversely, "rural reserves" are "land[s] reserved to provide long-term protection for agriculture, forestry or important natural landscape features that limit urban development or help define appropriate natural boundaries of urbanization, including plant, fish and wildlife habitat, steep slopes and floodplains." ORS 195.137(1).

[2] Seven respondents—including LCDC, Metro, and the counties—have appeared on review as well. In hundreds of pages of additional briefing, they ask the court to uphold LCDC's order.

As explained in greater detail below, we reject petitioners' contentions pertaining to, among other things, (1) the validity of the rules governing the designation of urban and rural reserves in this case (OAR chapter 660, division 27); (2) Metro's authority to designate reserves outside of its service district boundary; (3) whether too much land was designated as urban reserve under OAR 660-027-0040(2); and (4) whether the designation complies with particular Statewide Planning Goals. We also uphold nine fundamental legal premises underlying LCDC's review of the designation—that is, legal premises concerning Metro and the counties' "consideration" and "application" of the reserve factors and the meaning and application of OAR 660-027-0005(2) (otherwise known as the "best achieves standard"). Further, we reject most of petitioners' contentions concerning whether LCDC properly applied the substantial evidence standard of review.

Nevertheless, we conclude that LCDC erred in four respects. In particular, LCDC erred in (1) approving Washington County's misapplication of the rural reserve factors pertaining to agricultural land; (2) concluding that Multnomah County had adequately "considered" the rural reserve factors pertaining to Area 9D; (3) concluding that it has authority to affirm a local government's decision where its findings are inadequate if the evidence "clearly supports" the decision; and (4) failing to meaningfully explain why— even in light of weighty countervailing evidence—Metro and the counties' designation of Areas 4A to 4D (commonly referred to as Stafford) as urban reserves is supported by substantial evidence.

Accordingly, because LCDC's order is unlawful in substance in various respects, we reverse and remand LCDC's order for further action consistent with the principles expressed in this opinion. ORS 197.651(10)(a) (providing that "[t]he Court of Appeals shall reverse or remand the order only if the court finds the order is[,]" among other things, "[u]nlawful in substance").

## II.   STATUTORY AND REGULATORY FRAMEWORK

To provide necessary context, before turning to the procedural history of this case and the parties' specific

contentions on judicial review, we describe the general statutory and regulatory framework that governed the designation of urban and rural reserves in this case. That framework finds its origin in Senate Bill (SB) 1011 (2007).[3] We begin with the circumstances that precipitated the enactment of that framework.

## A.  *Senate Bill 1011 (2007)*

Metro is a metropolitan service district established pursuant to ORS chapter 268, ORS 197.015(14), that includes land in Clackamas, Multnomah, and Washington counties. Metro is responsible for coordinating land use planning in that tri-county region. ORS 195.025; ORS 268.385. Among Metro's responsibilities is the adoption of a regional UGB. *See generally* ORS 268.380 - 268.390 (describing Metro's planning and land use authority).

Before the 2007 legislative session during which SB 1011 was enacted, Metro—as well as others—identified deficiencies in the process by which Metro managed and expanded the regional UGB. Specifically, Randy Tucker, Legislative Affairs Manager for Metro, explained:

"*** The [current] system [for managing the Portland region's UGB] is dominated by two arbitrary numbers (20-year land supply requirement, [*see generally* ORS 197.296, and a] Metro-only five-year UGB evaluation cycle[, *see generally* ORS 197.299]) rather than by rules that are more responsive to the aspirations of the region. Today's system requires perpetual UGB expansions, but the 'low-hanging fruit' of obvious and easy expansion areas is gone. The current system offers no way to protect critical farmland or natural resources over the long term, yet it also fails to consider factors related to efficient and effective urbanization when deciding where to expand the UGB. The existing 'land hierarchy,' [*see generally* ORS 197.298,] which directs UGB expansions based on the quality of

---

[3] At the outset, we note that, after the Senate approved SB 1011, the House approved an amended version of the bill. Thereafter, the Senate concurred in those amendments and again approved the bill. Nevertheless, much of the legislative intent concerning the purpose of the bill and its basic structure that can be gleaned from proceedings before the House and Senate is substantively similar. Thus, for convenience and because the House-amended version of the bill was ultimately enacted, we refer generally to the legislative history of the bill in the House.

agricultural land may be too narrow; more criteria than soil type may be needed to decide what farmland is truly worth protecting and what areas are more logical to urbanize.

"As a result, current rules lead to UGB expansions where they are not wanted (especially for industrial use) and prevent expansions where they might be appropriate and desirable. For this reason and others, the current system, which requires Metro to start from scratch every five years, leads to conflict, uncertainty, and frustration for local governments, farmers, businesses, and individual citizens."

Testimony, House Committee on Energy and the Environment, SB 1011, May 21, 2007, Ex C (statement of Randy Tucker).

To determine how to address those deficiencies in the current system, Metro—at some point before the 2007 legislative session—obtained partial funding from the Department of Land Conservation and Development (DLCD) and, in conjunction with DLCD, the Oregon Department of Agriculture (ODA), and Clackamas, Multnomah, and Washington counties, conducted what has become known as the "Ag-Urban Study." *Id.* That study examined land outside Metro's UGB and focused on three overarching questions:

"• What lands are functionally critical to the **agricultural** economy (irrespective of soil type)?

"• What lands are critical in terms of **ecological** function (protecting water quality, plant and wildlife habitat, and key landscape features like steep slopes)?

"• What lands can most efficiently and effectively be integrated into the **urban** fabric of the region to create sustainable and complete communities?"

*Id.* (boldface in original). The answers to each of those questions were ultimately embodied in three documents—summaries of which Tucker provided to the House and Senate committees that considered SB 1011: (1) a January 2007 ODA report to Metro entitled "Identification and Assessment of the Long-Term Commercial Viability of Metro Region Agricultural Lands" (the ODA Report); (2) Metro's February 2007 "Natural Landscape Features Inventory" (the Natural Landscape Features Inventory); and (3) the "Great Communities Final Report" (the Great Communities

Report). Because those three documents pertain to, and provide context for, certain of the parties' contentions on review, we summarize their essential content at this point.[4]

The ODA Report described an analysis of agricultural lands based primarily on "an examination of both the capability (ability of the land to produce an agricultural product) and the suitability (ability to conduct viable farm use) of any given tract of land to be utilized for farm use." That examination focused, in turn, on particular subfactors related to capability (*e.g.*, the quantity and quality of soils and water) and suitability (*e.g.*, land use patterns; agricultural land use patterns; parcelization, tenure, and ownership patterns; agricultural infrastructure; zoning; location in relationship to adjacent lands zoned for nonresource development).

As a result of that analysis, ODA identified and mapped 20 agricultural subregions separated into three types of agricultural land categories—*viz.*, "Foundation," "Important," and "Conflicted"—which the report defined as follows:

> **"Foundation Agricultural Lands** are agricultural lands that provide the core support to the region's agricultural base. These lands anchor the region's larger agricultural base. They incubate and support the larger agricultural industry and are vital to its long-term viability. They have the attributes necessary to sustain current agricultural operations and to adapt to changing technologies and consumer demands.

> **"Important Agricultural Lands** are agricultural lands that are suited to agricultural production and contribute to or have the capacity to contribute to the commercial agricultural economy. These lands maintain the ability to remain viable over the long-term. They have the potential to be Foundation Agricultural Lands, but tend to be not utilized to their full potential. Trends in regional agricultur[e] could lead to a greater development of the agricultural capacity of these areas.

---

[4] We note that, for convenience, our quotations are taken from the original documents rather than the summaries that Tucker provided to the House and Senate committees that considered SB 1011. *See* Testimony, House Committee on Energy and the Environment, SB 1011, May 21, 2007, Ex C (statement of Randy Tucker); Testimony, Senate Committee on Environment and Natural Resources, SB 1011, Apr 10, 2007, Ex E (statement of Randy Tucker).

> "**Conflicted Agricultural Lands** are agricultural lands whose agricultural capacity (soils/water) is more times than not considered excellent but whose suitability is questionable primarily due to questions of integrity and ability to operate. These questions lead to issues of long-term viability. These lands are influenced by factors that diminish long-term certainty, which in turn tends to limit investment in agricultural operations by area farmers. These lands could become Important Agricultural Lands with changes in circumstances and trends in the industry. There may be individual or multiple operations within these areas that are conducting efficient, effective and viable operations."

(Boldface in original.)

Metro's Natural Landscape Features Inventory examined an area that "extended from north of Salem to the North Fork of the Lewis River on a north-south axis and from the Cascade foothills to the Coast Range on the east-west axis." The inventory identified 26 "features of the landscape that influence the sense of place for the greater region and ultimately will help define the future urban form of the greater region." Examples of natural landscape features identified in the inventory include (1) the "Cascade Foothills," which, among other things, provide "a scenic panorama for Portland and the eastside of the region" and "drinking water for the majority of the population of the region" and (2) "Forest Park Connections"—that is, the area that "provides protection to key watersheds like Balch, Miller, Ennis and Agency Creeks and secures the integrity of the 'big game' corridor that links the park with habitat in the northern Coast Range."

Finally, the Great Communities Report identified and described "eight essential characteristics" that "are the most important in making urbanization decisions"—*viz.*, (1) community design, (2) complete communities, (3) ecological systems, (4) optimization of public investments, (5) governance, (6) finance, (7) economy, and (8) education and workforce development. As an example, the report explained that "community design" recognizes that

> "[d]ensity, connectivity and legibility are considered essential characteristics in attaining cohesive community interaction, active populations and thriving business districts.

To support the characteristic of walkability, the area should have high enough densities and a diverse enough mix of uses within a quarter mile radius of centers to support walkability. A minimum of 12 to 16 dwelling units per acre in these areas is recommended. Additionally, the area should have the capacity to provide connectivity to and within the area for all automobiles, business-related trips, bicycles, pedestrians and transit. Legibility refers to areas that have rich, distinctive and site-specific attributes and forms that fit the natural environment and capitalize on unique and significant natural features. It also focuses on how people inside the area perceive the region as they move through it, in other words, how they define its sense of place. Features may include views of natural ordering elements such as Mount Hood, the presence of and visual access to significant local landmarks, the ability to create edges to the community and pathway systems throughout an area, to create districts, nodes or centers and to develop gateways into/out of the area."

SB 1011 emerged from the Ag-Urban Study process and, consequently, incorporated some of the principles expressed in the ODA Report, the Natural Landscape Features Inventory, and the Great Communities Report. Audio Recording, House Committee on Energy and the Environment, SB 1011, May 21, 2007, at 24:28 - 25:31 (statement of Randy Tucker), https://olis.leg.state.or.us (accessed Feb 6, 2014). Of particular significance, the urban reserve factors specified in SB 1011 derived from the Great Communities Report and the rural reserve factors derived from the ODA Report.[5] In sum, "SB 1011 [was] an attempt to align the law with the region's goals both for urbanization and for protection of areas that should not be urbanized."

---

[5] Testimony, House Committee on Energy and the Environment, SB 1011, May 30, 2007, Ex D (statement of Randy Tucker) ("[SB 1011] specifies factors that must be considered by local governments establishing urban reserves under the bill. These factors derive from the work done by local governments in the region entitled 'Great Communities' (see the eight 'Great Community Characteristics' in 'Great Communities: Executive Summary, January 2007). *** The objective of including these factors is to create an avenue for the designation of urban reserves that is based principally on the suitability of land for eventual urban development."); id. ("[SB 1011] specifies factors that must be considered by counties establishing rural reserves for protection of agricultural land. These factors derive from the work done for the region by [ODA] entitled 'Identification of Metro Region Agricultural Lands and Assessing Their Long-Term Commercial Viability.'").

Testimony, House Committee on Energy and the Environment, SB 1011, May 21, 2007, Ex C (statement of Randy Tucker).

During the course of the legislative hearings, a coalition that represented diverse interests continued to meet to refine SB 1011 and propose amendments to its provisions.[6] As ultimately enacted, SB 1011—which is codified at ORS 195.137 to 195.145[7]—authorized the designation of urban and rural reserves to provide "greater certainty" to commerce, industry, private land owners, and providers of public services by "facilitat[ing] long-range planning" for both urban and rural uses. ORS 195.139.

B.  *The Statutory Framework (ORS 195.137 - 195.145)*

Four salient aspects of the existing (post-SB 1011) statutory framework are most pertinent to the designation of urban and rural reserves in this case.

1.  *Process for Designation of Urban Reserves*

ORS 195.145(1)(b) authorizes a new, alternative process for the designation of urban reserves. Before the enactment of SB 1011, a process existed for the designation of such reserves. In determining which land to include as urban reserve, that existing process required that relative priorities be given to various types of lands. *See generally* OAR 660-021-0000 - 660-021-0080 (the division 21 rules). Of particular significance, OAR 660-021-0030(2) provides, *inter alia*, that the "[i]nclusion of land within an urban reserve shall be based upon the locational factors of [Statewide Planning] Goal 14 [(Goal 14)] and a demonstration that

---

[6] In addition to Metro, supporters of SB 1011 included:

"Home Builders Association of Metropolitan Portland; Portland Association of Realtors; Associated General Contractors; 1000 Friends of Oregon; Association of Nurseries; Oregon Winegrowers Association; American Institute of Architects Oregon; Washington, Clackamas, and Multnomah Counties; cities throughout the region, including Hillsboro, Wilsonville, Sandy, and Portland; [ODA]; and [DLCD]."

Testimony, House Committee on Energy and the Environment, SB 1011, May 21, 2007, Ex C (statement of Randy Tucker).

[7] The parties do not challenge LCDC's application of the 2009 version of ORS 195.137 to 195.145. Thus, throughout the remainder of this opinion, all references to ORS 195.137 to 195.145 are to the 2009 version. The text of the pertinent statutes is set out below.

there are no reasonable alternatives that will require less, or have less effect upon, resource land." Further, OAR 660-021-0030(2) provides that, once determined to be suitable, land may be designated as urban reserve only according to a set of priorities in OAR 660-021-0030(3) related to the agricultural quality of the land.

Although SB 1011 continued to provide for designation of urban reserves under that existing process, ORS 195.145(1)(a), it also established a new, alternative process, ORS 195.145(1)(b), under which the reserves in this case were designated. As Representative Jackie Dingfelder explained, this "new process for designating urban reserves," which "are the first in line when land needs to be brought into the UGB," is

"based on a set of factors that consider how well land can be woven into the urban fabric of the region rather than the current approach of selecting urban reserves based on factors that are related to their quality as farm land. In effect, this will make it easier to urbanize land that may have good soil but is not necessarily critical to the agricultural economy."

Audio Recording, House Floor Debate, SB 1011, June 11, 2007, at 1:48:58 - 1:49:40 (statement of bill's carrier Rep Dingfelder), https://olis.leg.state.or.us (accessed Feb 6, 2014).[8]

Central to that alternative designation process is a nonexclusive set of six urban reserve factors—derived from the Great Communities Report—that Metro and a county must "consider" in designating urban reserves under ORS 195.145(1)(b). Specifically, ORS 195.145(5) provides:

"[Metro] and a county *shall base the designation of urban reserves under subsection (1)(b) of this section upon consideration of factors including, but not limited to,* whether land proposed for designation as urban reserves, alone or in conjunction with land inside the [UGB]:

---

[8] *See also* Testimony, House Committee on Energy and the Environment, SB 1011, May 21, 2007, Ex C (statement of Randy Tucker) ("The bill also provides a new pathway for the creation of urban reserves, or areas that should be first in line for urbanization, in the Portland metropolitan area. These modifications should make it easier to designate urban reserves by providing a pathway based on urban factors as an alternative to the 'land hierarchy' in the existing urban reserve administrative rule, which is similar to the statutory UGB hierarchy.").

"(a)  Can be developed at urban densities in a way that makes efficient use of existing and future public infrastructure investments;

"(b)  Includes sufficient development capacity to support a healthy urban economy;

"(c)  Can be served by public schools and other urban-level public facilities and services efficiently and cost-effectively by appropriate and financially capable service providers;

"(d)  Can be designed to be walkable and served by a well-connected system of streets by appropriate service providers;

"(e)  Can be designed to preserve and enhance natural ecological systems; and

"(f)  Includes sufficient land suitable for a range of housing types."

(Emphasis added.)

In addition, the *amount* of land that Metro and a county can designate as urban reserves under ORS 195.145(1)(b) is limited. ORS 195.145(4) provides:

"Urban reserves designated by [Metro] and a county pursuant to subsection (1)(b) of this section must be planned to accommodate population and employment growth for at least 20 years, and not more than 30 years, after the 20-year period for which [Metro] has demonstrated a buildable land supply in the most recent inventory, determination and analysis performed under ORS 197.296."

Stated simply, ORS 195.145(4) establishes an "urban reserves planning period"—that is, a period between 20 and 30 years beyond the 20-year UGB planning period. Urban reserves designated under ORS 195.145(1)(b) "must be planned to accommodate population and employment growth" during the urban reserves planning period. ORS 195.145(4).

2.  *Process for Designation of Rural Reserves*

ORS 195.141 authorizes the designation of a new type of reserves—*viz.*, rural reserves. "These are the lands that are critical to the functioning and long-term viability of the agricultural industry irrespective of soil quality, and

rural reserves can also be established to protect import-ant natural areas." Audio Recording, House Floor Debate, SB 1011, June 11, 2007, at 1:49:47 - 1:50:05 (statement of Rep Dingfelder), https://olis.leg.state.or.us (accessed Feb 6, 2014). Before the enactment of SB 1011, there had been "no legal authorization to protect th[o]se lands over the long term." Testimony, House Committee on Energy and the Environment, SB 1011, May 21, 2007, Ex C (statement of Randy Tucker).

Unlike with urban reserves, the legislature did not impose a limitation on the amount of land that may be des-ignated as rural reserves. Instead, the legislature imposed a temporal restriction on the development of such reserves. Specifically, land that is designated as rural reserve (1) must be outside of a UGB, (2) "[m]ay not be designated as an urban reserve during the urban reserve planning period," and (3) may not be included in a UGB during the urban reserve planning period. ORS 195.141(2). In practical terms, this means that land designated as rural reserve is essentially not subject to urban development for up to a total period of 40 to 50 years—that is, the 20-year UGB planning period plus the 20- to 30-year urban reserves planning period.

As with the designation of urban reserves, the pro-cess for designating rural reserves requires the "consider-ation" of a nonexclusive list of factors, which were derived from the ODA Report. Specifically, ORS 195.141(3) provides:

"When designating a rural reserve under this section to provide long-term protection to the agricultural industry, a county and [Metro] *shall base the designation on consider-ation of factors including, but not limited to*, whether land proposed for designation as a rural reserve:

"(a) Is situated in an area that is otherwise poten-tially subject to urbanization during the [urban reserves planning period], as indicated by proximity to the [UGB] and to properties with fair market values that significantly exceed agricultural values;

"(b) Is capable of sustaining long-term agricultural operations;

"(c) Has suitable soils and available water where needed to sustain long-term agricultural operations; and

"(d)   Is suitable to sustain long-term agricultural operations, taking into account:

"(A)   The existence of a large block of agricultural or other resource land with a concentration or cluster of farms;

"(B)   The adjacent land use pattern, including its location in relation to adjacent nonfarm uses and the existence of buffers between agricultural operations and nonfarm uses;

"(C)   The agricultural land use pattern, including parcelization, tenure and ownership patterns; and

"(D)   The sufficiency of agricultural infrastructure in the area."

(Emphasis added.)

### 3.   *Intergovernmental Coordination and Cooperation*

The designation of urban and rural reserves requires coordination and agreement between Metro and the counties. To that end, ORS 195.143(1) provides that Metro and a county "must consider simultaneously the designation and establishment" of rural reserves pursuant to ORS 195.141 and urban reserves pursuant to ORS 195.145(1)(b). As Tucker explained, the direction "to consider the establishment of rural and urban reserves simultaneously" ensures "coordination of the planning of both types of reserves and consideration of the relationships between them." Testimony, House Committee on Energy and the Environment, SB 1011, May 30, 2007, Ex D (statement of Randy Tucker).

Ultimately, the designation of reserves occurs through agreements between Metro and a county.[9] As Representative Dingfelder explained on the floor of the House, under the new process established in SB 1011, "neither urban reserves

---

[9] *See generally* ORS 195.141(1) (authorizing agreement to designate rural reserves as well as urban reserves pursuant to ORS 195.145(1)(b)); ORS 195.145(1)(b) (authorizing agreement to designate urban reserves); ORS 195.143(2) (providing that rural reserves as well as urban reserves pursuant to ORS 195.145(1)(b) may not be designated absent agreement and requiring that an agreement between Metro and a county "must provide for a coordinated and concurrent process for adoption by the county of comprehensive plan provisions and by [Metro] of regional framework plan provisions to implement the agreement").

nor rural reserves can be created * * * unless Metro and a county agree about both urban and rural reserves. This provides a greater degree of protection and accountability." Audio Recording, House Floor Debate, SB 1011, June 11, 2007, at 1:50:10 - 1:50:25 (statement of Rep Dingfelder), https://olis.leg.state.or.us (accessed Feb 6, 2014).

Of particular significance, the coalition in support of SB 1011 agreed that urban reserves may not be designated in a county unless rural reserves are designated in that county as well.[10] To that end, ORS 195.143(3) provides:

> "A county and [Metro] may not enter into an intergovernmental agreement to designate urban reserves in the county pursuant to ORS 195.145(1)(b) unless the county and [Metro] also agree to designate rural reserves in the county."

### 4. LCDC Rulemaking Authority

The legislature authorized LCDC to engage in rulemaking concerning the designation of urban and rural reserves. ORS 195.145(6) ("[LCDC] shall adopt by goal or by rule a process and criteria for designating urban reserves pursuant to subsection (1)(b) of this section."); ORS 195.141(4) ("[LCDC] shall, after consultation with [ODA], adopt by goal or by rule a process and criteria for designating rural reserves pursuant to this section.").

### C. The Regulatory Framework (OAR chapter 660, division 27)

In response to that rulemaking authorization, LCDC promulgated the rules in OAR chapter 660, division 27 (the division 27 rules), which governed the designation of

---

[10] As Tucker explained during a work session in the House Committee on Energy and the Environment,

> "because we are creating a new process for the creation of urban reserves and this new process does not go through the existing priority of lands in the urban reserve rule and instead is based on some urban factors, * * * if you're going to use that new process and not consider the farmland aspect of it, then you need to also, in that county, designate some rural reserves. That was an agreement that the coalition came to last week."

Audio Recording, House Committee on Energy and the Environment, SB 1011, May 23, 2007, at 1:11:40 - 1:12:12 (statement of Randy Tucker), https://olis.leg.state.or.us (accessed Feb 6, 2014).

urban and rural reserves in this case.[11] OAR 660-027-0005(2) establishes the objective of the division 27 rules—which has become known as the "best achieves standard." That rule provides, in pertinent part:

> *"The objective of [division 27] is a balance in the designation of urban and rural reserves that, in its entirety,* **best achieves** *livable communities,*[12] *the viability and vitality of the agricultural and forest industries and protection of the important natural landscape features that define the region for its residents."*

(Emphasis and boldface added.)

To achieve the "best achieves" objective, "[w]hen evaluating and designating land for urban reserves," OAR 660-027-0040(8) provides that Metro and a county "shall apply the factors of OAR 660-027-0050." In turn, in promulgating OAR 660-027-0050, LCDC incorporated the urban reserve factors from ORS 195.145(5), *see* 261 Or App at 272-73, and also established two additional factors—*i.e.*, OAR 660-027-0050(7) and (8).[13] Specifically, OAR 660-027-0050 provides:

> "When identifying and selecting lands for designation as urban reserves under this division, Metro shall base its decision on consideration of whether land proposed for designation as urban reserves, alone or in conjunction with land inside the UGB:
>
> "(1) Can be developed at urban densities in a way that makes efficient use of existing and future public and private infrastructure investments;

---

[11] LCDC originally promulgated the division 27 rules in 2008; however, some of those rules have since been amended. The parties do not challenge LCDC's application of the October 20, 2010, version of the division 27 rules. Thus, throughout this opinion, all references to those rules are to that version.

[12] "Livable communities," in turn, "means communities with development patterns, public services and infrastructure that make them safe, healthy, affordable, sustainable and attractive places to live and work." OAR 660-027-0010(4).

[13] *See* Testimony, House Committee on Energy and the Environment, SB 1011, May 30, 2007, Ex D (statement of Randy Tucker) (explaining that the urban and rural reserve "factors were written into the bill to provide more detailed guidance to LCDC, which requested the guidance to aid and speed the rulemaking required by [SB 1011]" and that the lists of factors were "not intended to be exclusive; LCDC remains free to require consideration of other factors in rulemaking").

"(2) Includes sufficient development capacity to support a healthy economy;

"(3) Can be efficiently and cost-effectively served with public schools and other urban-level public facilities and services by appropriate and financially capable service providers;

"(4) Can be designed to be walkable and served with a well-connected system of streets, bikeways, recreation trails and public transit by appropriate service providers;

"(5) Can be designed to preserve and enhance natural ecological systems;

"(6) Includes sufficient land suitable for a range of needed housing types;

"(7) Can be developed in a way that preserves important natural landscape features included in urban reserves; and

"(8) Can be designed to avoid or minimize adverse effects on farm and forest practices, and adverse effects on important natural landscape features, on nearby land including land designated as rural reserves."

Consistently with the quantitative "cap" on urban reserve designations prescribed by ORS 195.145(4), LCDC also promulgated OAR 660-027-0040(2)—which is known as the "amount of land standard." Specifically, that rule provides:

"Urban reserves designated under this division shall be planned to accommodate estimated urban population and employment growth in the Metro area for at least 20 years, and not more than 30 years, beyond the 20-year period for which Metro has demonstrated a buildable land supply inside the UGB in the most recent inventory, determination and analysis performed under ORS 197.296. Metro shall specify the particular number of years for which the urban reserves are intended to provide a supply of land, based on the estimated land supply necessary for urban population and employment growth in the Metro area for that number of years. The 20 to 30-year supply of land specified in this rule shall consist of the combined total supply provided by all lands designated for urban reserves in all counties that have executed an intergovernmental agreement with Metro in accordance with OAR 660-027-0030."

With respect to the designation of land for rural reserves, OAR 660-027-0040(9) provides that, "[w]hen evaluating and designating land" for such reserves, Metro and a county "shall apply the factors of OAR 660-027-0060." In promulgating OAR 660-027-0060, LCDC incorporated the rural reserve factors from ORS 195.141(3), *see* 261 Or App at 274-75, that pertained to protection of the agricultural industry but also extended their application to the forest industry. Specifically, OAR 660-027-0060(2) provides:

"When identifying and selecting lands for designation as rural reserves intended to provide long-term protection to the agricultural industry or forest industry, or both, a county shall base its decision on consideration of whether the lands proposed for designation[:]

"(a)   Are situated in an area that is otherwise potentially subject to urbanization during the [urban reserves planning period] as indicated by proximity to a UGB or proximity to properties with fair market values that significantly exceed agricultural values for farmland, or forestry values for forest land;

"(b)   Are capable of sustaining long-term agricultural operations for agricultural land, or are capable of sustaining long-term forestry operations for forest land;

"(c)   Have suitable soils where needed to sustain long-term agricultural or forestry operations and, for agricultural land, have available water where needed to sustain long-term agricultural operations; and

"(d)   Are suitable to sustain long-term agricultural or forestry operations, taking into account:

"(A)   [F]or farm land, the existence of a large block of agricultural or other resource land with a concentration or cluster of farm operations, or, for forest land, the existence of a large block of forested land with a concentration or cluster of managed woodlots;

"(B)   The adjacent land use pattern, including its location in relation to adjacent non-farm uses or non-forest uses, and the existence of buffers between agricultural or forest operations and non-farm or non-forest uses;

"(C)   The agricultural or forest land use pattern, including parcelization, tenure and ownership patterns; and

"(D)    The sufficiency of agricultural or forestry infrastructure in the area, whichever is applicable."

Further, during rulemaking, LCDC established factors for the designation of rural reserves to protect important natural landscape features. Specifically, OAR 660-027-0060(3) provides:

"When identifying and selecting lands for designation as rural reserves intended to protect important natural landscape features, a county must consider those areas identified in Metro's February 2007 'Natural Landscape Features Inventory' and other pertinent information, and shall base its decision on consideration of whether the lands proposed for designation:

"(a)    Are situated in an area that is otherwise potentially subject to urbanization during the [urban reserves planning period];

"(b)    Are subject to natural disasters or hazards, such as floodplains, steep slopes and areas subject to landslides;

"(c)    Are important fish, plant or wildlife habitat;

"(d)    Are necessary to protect water quality or water quantity, such as streams, wetlands and riparian areas;

"(e)    Provide a sense of place for the region, such as buttes, bluffs, islands and extensive wetlands;

"(f)    Can serve as a boundary or buffer, such as rivers, cliffs and floodplains, to reduce conflicts between urban uses and rural uses, or conflicts between urban uses and natural resource uses[;]

"(g)    Provide for separation between cities; and

"(h)    Provide easy access to recreational opportunities in rural areas, such as rural trails and parks."

In addition to amplifying the substantive standards for designating urban and rural reserves, the division 27 rules—consistently with the statutory directive, *see* ORS 195.143—also require intergovernmental coordination and cooperation. For example, OAR 660-027-0040(10) provides that "Metro and any county that enters into an agreement with Metro under this division shall apply the factors in OAR 660-027-0050 [(concerning urban reserves)] and OAR 660-027-0060 [(concerning rural reserves)] concurrently and in

coordination with one another." In addition, Metro and the counties with which Metro has entered into an agreement

> "shall adopt a single, joint set of findings of fact, statements of reasons and conclusions explaining why areas were chosen as urban or rural reserves, how these designations achieve the objective stated in OAR 660-027-0005(2) [(the 'best achieves standard')], and the factual and policy basis for the estimated land supply determined under [OAR 660-027-0040(2) (the 'amount of land standard')]."

OAR 660-027-0040(10).

Finally, there are two substantial exceptions to the overarching mandates of OAR 660-027-0040(10). The application (if any) of each is vehemently disputed by the present parties.

The first exception is OAR 660-027-0060(4)—the so-called "safe harbor provision." The "safe harbor provision" dispenses with the requirements that a county apply the factors in OAR 660-027-0060(2) in designating certain land as rural reserves and the requirement that Metro and the county explain why that land was selected as rural reserves. Specifically, OAR 660-027-0060(4) provides:

> "Notwithstanding requirements for applying factors in OAR 660-027-0040(9) and [OAR 660-027-0060(2)], a county may deem that Foundation Agricultural Lands or Important Agricultural Lands[14] within three miles of a UGB qualify for designation as rural reserves under [OAR 660-027-0060(2)] without further explanation under OAR 660-027-0040(10)."

The second exception is OAR 660-027-0040(11). That provision imposes additional requirements on Metro to the extent that it seeks to designate Foundation Agricultural Land as urban reserve. Specifically, OAR 660-027-0040(11) provides:

> "Because the [ODA report] indicates that Foundation Agricultural Land is the most important land for the viability and vitality of the agricultural industry, if Metro designates such land as urban reserves, the findings and

---

[14] Foundation Agricultural Lands and Important Agricultural Lands are those lands mapped as such in the ODA Report. OAR 660-027-0010(1) (so defining Foundation Agricultural Lands); OAR 660-027-0010(2) (so defining Important Agricultural Lands).

statement of reasons shall explain, by reference to the factors in OAR 660-027-0050 and 660-027-0060(2), why Metro chose the Foundation Agricultural Land for designation as urban reserves rather than other land considered under this division."

## III. PROCEDURAL HISTORY

In 2010, Metro and Clackamas, Multnomah, and Washington counties made the initial designation of urban and rural reserves that are at issue in this case. We take the undisputed procedural facts concerning the designation from LCDC's order.

"Metro's initial decision to designate urban reserves in the three-county region was made on June 3, 2010. Multnomah, Clackamas and Washington counties made their initial final decisions to designate rural reserves in their counties, respectively, on May 13, 27 and June 15, 2010. The four governments submitted their joint and concurrent decision to [DLCD] on June 23, 2010. The initial submittal established a system of urban and rural reserves in the three-county region to guide long-term planning to the year 2060. The initial submittal designated 28,615 acres of urban reserves to accommodate urban growth to 2060, and 266,954 acres of rural reserves to protect agricultural land, forest land and important natural landscape features from urbanization for 50 years. The initial submittal included changes to the counties' comprehensive plans and Metro's [Regional Framework Plan (RFP)] and [Urban Growth Management Functional Plan (UGMFP)], including plan maps that depict the urban and rural reserves."

The director of DLCD referred Metro and the counties' initial submittal—that is, Metro Ordinance No. 10-1238A—to LCDC for review in the manner provided for periodic review. *See generally* ORS 197.626(1)(c), (f) (providing for LCDC review of urban and rural reserves "in the manner provided for review of a work task under ORS 197.633"); ORS 197.628 - 197.650 (governing periodic review process); OAR chapter 660, division 25 (the division 25 rules) (rules implementing periodic review process).[15]

---

[15] The parties do not challenge LCDC's application of the 2011 version of the statutes governing periodic review, ORS 197.628 - 197.650, or its general application of the May 15, 2006, version of the division 25 rules, with a single exception described below, 261 Or App at 284 n 16. Thus, throughout this opinion, references to those statutes and rules are to the versions applied by LCDC.

Pursuant to OAR 660-027-0080(4), LCDC was required to review the submittal for

"(a) Compliance with the applicable statewide planning goals. Under ORS 197.747 'compliance with the goals' means the submittal on the whole conforms with the purposes of the goals and any failure to meet individual goal requirements is technical or minor in nature. To determine compliance with the Goal 2 requirement for an adequate factual base, [LCDC] shall consider whether the submittal is supported by substantial evidence. Under ORS 183.482(8)(c), substantial evidence exists to support a finding of fact when the record, viewed as a whole, would permit a reasonable person to make that finding;

"(b) Compliance with applicable administrative rules, including but not limited to the objective provided in OAR 660-027-0005(2) [('the best achieves standard')] and the urban and rural reserve designation standards provided in OAR 660-027-0040; and

"(c) Consideration of the factors in OAR 660-027-0050 or 660-027-0060, whichever are applicable."

In October 2010, LCDC held a hearing concerning the initial submittal. At that hearing, LCDC (1) "approve[d] the urban and rural reserve designations as submitted in Clackamas and Multnomah counties" and "approve[d] the urban reserves in Washington County, with the exception of two areas"; (2) reversed the urban reserve designation of one of those excepted areas and remanded the designation of the other for further findings; and (3) "remand[ed] the rural reserve designations in Washington County for further consideration in light of changes made on remand" to those two areas.

In response to LCDC's ruling at the conclusion of the hearing, Metro and Washington County adopted amendments to their planning documents to revise the reserve designations. "The Metro and Washington County re-designations," which were submitted on May 13, 2011, "adjusted the urban and rural reserve designations in

Washington County" in several ways.[16] The net effect of those adjustments "was to decrease the amount of urban reserves designated by 299 acres, to decrease the amount of rural reserves designated by 120 acres, and to increase the amount of undesignated lands in Washington County by 419 acres." In addition, "[t]he re-designations also added findings addressing more specifically both the urban and rural reserve factors in cases where Metro designated Foundation Agricultural Land in Washington County for urban reserves." In sum,

"[f]ollowing the re-designations and with the adoption of Metro Ordinance No. 11-1255, Metro has designated 28,256 gross acres as urban reserves throughout the three-county region. Clackamas County Ordinance No. ZDO-233 designates 68,713 acres as rural reserves. Multnomah County Ordinance No. 20-10-1161 designates 46,706 acres as rural reserves. Washington County Ordinance No. 740 designates 151,209 acres of rural reserves. The total of rural reserves throughout the three counties is 266,628 [acres]."

---

[16] On June 23, 2011, following the submission of the redesignation submittal, the legislature amended ORS 197.633 to provide for LCDC's standard of review. Or Laws 2011, ch 469, § 2. Specifically, ORS 197.633(3) provides, in part, that LCDC "shall confine its review of the evidence to the local record" and that

"[LCDC's] standard of review:

"(a) For evidentiary issues, is whether there is substantial evidence in the record as a whole to support the local government's decision.

"(b) For procedural issues, is whether the local government failed to follow the procedures applicable to the matter before the local government in a manner that prejudiced the substantial rights of a party to the proceeding.

"(c) For issues concerning compliance with applicable laws, is whether the local government's decision on the whole complies with applicable statutes, statewide land use planning goals, administrative rules, the comprehensive plan, the regional framework plan, the functional plan and land use regulations. The commission shall defer to a local government's interpretation of the comprehensive plan or land use regulations in the manner provided in ORS 197.829. For purposes of this paragraph, 'complies' has the meaning given the term 'compliance' in the phrase 'compliance with the goals' in ORS 197.747."

To the extent that the 2011 amendments to ORS 197.633 conflicted with the May 15, 2006, version of the division 25 rules, LCDC applied the statute to its review of the redesignation submittal. In that regard, LCDC specifically explained that, although it was permitted under its rules to consider new evidence and did consider and receive such evidence when reviewing the initial submittal, its review of the redesignation submittal—following the statutory amendments—was confined "to the local record," ORS 197.633(3), and, for that reason, it did not consider new evidence in reviewing that submittal.

Ultimately, LCDC issued an acknowledgment order "approving the 2010 initial submittal [(Metro Ordinance No. 10-1238A)], as revised through the 2011 re-designation submittal [(Metro Ordinance No. 11-1255)], which together constitute the Metro Urban and Rural Reserves Submittal." This judicial review followed. ORS 197.626(2) (providing that a final order of LCDC concerning the designation of urban and rural reserves under ORS 195.137 to 195.145 "may be appealed to the Court of Appeals in the manner described in ORS 197.650 and 197.651"); ORS 197.650(2) ("Jurisdiction for judicial review of a final order of [LCDC] issued pursuant to *** ORS 197.626 *** is conferred upon the Court of Appeals.").

On review, 22 petitioners challenge LCDC's order.[17] Petitioners' myriad contentions range from the sublime to the arcane to the mundane—that is, from fundamental methodological issues pertaining, *inter alia*, to LCDC's understanding and application of the legal principles that govern the designation of urban and rural reserves and the review of such designations to fact-specific challenges relating to the evidentiary sufficiency of Metro and the counties' submittal.

As framed by the parties' contentions, we review LCDC's order to determine whether it is "[u]nlawful in substance." ORS 197.651(10)(a).[18] In conducting that review, we

---

[17] In particular, nine groups of petitioners appeared separately on review: (1) Save Helvetia and Robert Bailey (Save Helvetia); (2) 1000 Friends of Oregon, Dave Vanasche, Bob VanderZanden, and Larry Duyck (Friends); (3) Carol Chesarek and Cherry Amabisca (Chesarek); (4) Chris Maletis, Tom Maletis, Exit 282A Development Company, LLC, and LFGC, LLC (Maletis); (5) Elizabeth Graser-Lindsey and Susan McKenna (Graser-Lindsey); (6) the City of West Linn and the City of Tualatin (West Linn); (7) Metropolitan Land Group (MLG); (8) Barkers Five, LLC, and Sandy Baker (Barkers); and (9) Springville Investors, LLC, Katherine Blumenkron, and David Blumenkron (Springville). In addition, six groups of respondents appeared separately on review: (1) LCDC and the State of Oregon (LCDC), (2) Metro, (3) Clackamas County, (4) Multnomah County, (5) Washington County, and (6) the City of Hillsboro.

[18] We note that ORS 197.651—which was enacted in 2007 as part of SB 1011—applied to the judicial review of LCDC orders designating urban and rural reserves under the provisions of that bill. Or Laws 2007, ch 723, § 9. As pertinent, the standard of review described in ORS 197.651(10) replaced the standard derived from the Administrative Procedures Act, which we had generally applied when reviewing an LCDC order. *See* ORS 197.650(1) (2009) (providing,

are confined to the record (albeit gargantuan) of LCDC's action. ORS 197.651(9)(a).

Further, in analyzing petitioners' contentions, we note that, consistently with our typical practice, we will generally identify the proponent of a particular contention. However, given the large number of parties, the fundamental nature of many of the contentions on review, and the fact that many parties adopted arguments articulated by others, we will, in some instances, occasionally address a contention without identifying its particular proponent or proponents.

With those "ground rules" established, we turn to the merits of the parties' contentions on review. We begin by addressing, and rejecting, several threshold "systemic" challenges, which, if accepted, would necessitate a remand without any further consideration of petitioners' remaining contentions. *See* 261 Or App at 287-88. Next, we consider petitioners' particularized contentions concerning whether LCDC's order is "unlawful in substance." Those contentions relate to five transcendent matters:

(1) Compliance with the "amount of land standard" in OAR 660-027-0040(2), *see* 261 Or App at 288;

(2) Compliance with statewide planning goals, *see* 261 Or App at 288-93;

(3) The proper consideration and application of the urban reserve factors in OAR 660-027-0050 and the rural reserve factors in OAR 660-027-0060, *see* 261 Or App at 293-311;

(4) The meaning and application of the "best achieves standard" in OAR 660-027-0005(2), *see* 261 Or App at 311-18; and

---

in part, that LCDC orders "may be appealed to the Court of Appeals in the manner provided in ORS 183.482"); *see also 1000 Friends of Oregon v. LCDC*, 237 Or App 213, 239 P3d 272 (2010) (applying that standard; reasoning that, to be adequate for judicial review, LCDC's order had to demonstrate substantial reason). Thereafter, in 2011, ORS 197.651 was amended so that other types of LCDC orders became subject to the standard of review in subsection (10). Or Laws 2011, ch 469, § 6; *cf. 1000 Friends of Oregon v. LCDC*, 260 Or App 444, 317 P3d 927 (2014) (applying pre-2011 standard of judicial review where the case was pending before the effective date of the 2011 amendments and our decision issued thereafter). This is the first case in which we have applied the standard of review in ORS 197.651(10)—which is substantively akin to our standard of review of Land Use Board of Appeals orders. *Compare* ORS 197.651(10) (standard for reviewing LCDC orders), *with* ORS 197.850(9) (standard for reviewing LUBA orders).

(5) LCDC's substantial evidence review, *see* 261 Or App at 347-63.

## IV. PRELIMINARY CONTENTIONS: "CLEARING THE DECKS"

At the outset, we "clear the decks" by rejecting, without extended discussion, two preliminary contentions either of which, if correct, would have obviated the need to consider the parties' remaining contentions. First, we reject without discussion petitioner Springville's first assignment of error in which it contends that the division 27 rules are invalid in their entirety.

Second, in his third assignment of error, petitioner Maletis contends that Metro lacked authority to designate reserves outside of its service district boundary. That is so, Maletis asserts, because ORS 195.137 to 195.145 do not "explicitly extend the geographic scope of Metro's governing authority outside of [that boundary]."

However, as LCDC noted, a provision of Metro's charter provides, "'The Metro Area of governance includes all territory within the boundaries of the Metropolitan Service District * * * and any territory * * * *subjected to Metro governance under state law*.'" (First omission and emphasis in LCDC's order.) Here, the text of the statutory scheme, as a whole, clearly demonstrates that Metro is authorized to designate reserves outside its district boundary. Thus, the statutes subject such lands to Metro's governance at least for the purpose of designating them as reserves. Further, legislative history supports that understanding of the statutory scheme. The following exchange occurred during the floor debate in the House:

> Representative Krummel: "Can Metro designate lands outside of their boundaries as rural reserves?"
>
> Representative Dingfelder: "Yes, and that's part of the point of the bill. However, if you read the bill, it has to be in conjunction with the counties, so it has to be in conjunction with the counties for approval."

Audio Recording, House Floor Debate, SB 1011, June 11, 2007, at 1:51:42 - 1:52:05, https://olis.leg.state.or.us (accessed

Feb 6, 2014). Although that question and response referred to rural reserves, it is clear from the exchange that the SB 1011 was intended to authorize Metro and the counties to do exactly what they did here.

Having rejected those preliminary contentions, we proceed to petitioners' more focused challenges pertaining to whether LCDC's order is unlawful in substance because, in reviewing Metro and the counties' submittal, LCDC misunderstood and misapplied the legal principles governing the designation of urban and rural reserves and circumscribing its review. We begin by rejecting four contentions pertaining to the first two pervasive challenges identified above, 261 Or App at 286—*viz.*, compliance with the "amount of land standard" and particular statewide planning goals.

## V. UNLAWFUL IN SUBSTANCE CONTENTIONS: COMPLIANCE WITH "AMOUNT OF LAND STANDARD" AND STATEWIDE PLANNING GOALS

### A. *"Amount of Land Standard" in OAR 660-027-0040(2)*

We begin with the contentions pertaining to whether too much land is designated as urban reserve. Specifically, in her third assignment of error, petitioner Chesarek contends that LCDC erred in approving "an amount of acres for urban reserves that exceeds the statutory 30-year limit," in violation of the quantitative "cap" on urban reserve designations prescribed by ORS 195.145(4) and the amount of land standard in OAR 660-027-0040(2).[19] We have considered that contention and reject it without discussion.

### B. *Statewide Planning Goals*

#### 1. *Application of Economic Development Goal (Goal 9)*

In his fourth assignment of error, Maletis contends that LCDC erred in concluding that Goal 9, which pertains to economic development, was not applicable to the designation of urban and rural reserves and, alternatively, in concluding that, to the extent that the goal was implicated, there was substantial evidence in the record to demonstrate compliance. That goal is designed "[t]o provide adequate opportunities throughout the state for a variety of

---

[19] The text of OAR 660-027-0040(2) is set out above at 261 Or App at 278.

economic activities vital to the health, welfare, and prosperity of Oregon's citizens." Among Goal 9's implementing rules is OAR 660-009-0010(1), which expressly provides that the rules "appl[y] to comprehensive plans for areas within urban growth boundaries" and "do[] not require or restrict planning for industrial and other employment uses outside urban growth boundaries."

Before LCDC, Maletis objected that "[t]here is no substantial evidence or related findings to meaningfully assure that the Decision, as it will be implemented by the Counties is in compliance with Goal 9." LCDC denied that objection on two alternative grounds.

First, LCDC concluded that Goal 9 was inapplicable to the designation of urban and rural reserves. Specifically, relying on the goal's implementing rules, LCDC explained that, "[g]enerally, Goal 9 does not establish planning requirements for local governments outside of [UGBs]" and that "[a]ll urban and rural reserves lie outside the Metro regional UGB." LCDC also noted that Maletis had not "cite[d] any authority that requires independent findings by Metro to demonstrate compliance with Goal 9 on a regional basis."

Second, and alternatively, LCDC determined that, to the extent that Goal 9 is implicated, the submittal was in compliance with the goal. Specifically, LCDC reasoned:

"To the extent Goal 9 is implicated through this process, the applicable requirement for determining potential future land need for employment is contained in OAR 660-027-0050(2). Metro analyzed the need for employment land for the planning period and accommodated it. Metro also made findings relative to Goal 9 in the Urban Growth Report on which it relied in evaluating land needs under the rule. It also made findings regarding Goal 9 compliance for each of the counties * * * and a general finding of goal compliance.[20] However, the specific provisions of Goal 9 generally apply inside UGBs, and 'implementation' of the urban reserves submittal for purposes of Goal 9 will take place at the time the UGB is amended by Metro. Metro

---

[20] The "findings" in the submittal concerning Goal 9 essentially indicated that the goal was inapplicable but that the designation of urban reserves would help achieve the objectives underlying the goal.

may, at that time, designate specific lands for employment use in order to be consistent with Goal 9."

(Footnote and record citations omitted.)

On review, Maletis challenges each of LCDC's alternative, and independently sufficient, grounds for rejecting his objection. In particular, relying on the requirement in the goal "[t]o provide adequate opportunities throughout the state for a variety of economic activities" as well as OAR 660-027-0080(4) and ORS 197.175(2), Maletis contends that "LCDC erred in concluding that Goal 9 was not applicable" to the designation of urban and rural reserves. Further, Maletis contends that "LCDC erred in concluding that there was substantial evidence in the whole record to support the conclusion that the Reserves Decision was in compliance with Goal 9."

As amplified below, Maletis's first contention is incorrect. Two salient observations suffice to demonstrate why that is so.

First, the text of Goal 9 and its implementing regulations demonstrate that the goal applies solely to comprehensive plans governing land *within urban growth boundaries*. According to its terms, the purpose of the goal is "to provide adequate opportunities throughout the state for a variety of economic activities." That purpose is achieved by the goal's stated and limited application to "comprehensive plans for urban areas."[21] LCDC adopted rules "to implement Goal 9," OAR chapter 660, division 9, which provide that the goal applies only to areas within an urban growth boundary. Specifically, OAR 660-009-0010(1) provides:

"This division applies to comprehensive plans for areas within urban growth boundaries. This division does not require or restrict planning for industrial and other employment uses outside urban growth boundaries. Cities and counties subject to this division must adopt plan and ordinance amendments necessary to comply with this division."

---

[21] Although the term "urban area" is not defined in the goals, it is clear from the context of the goals that an "urban area" refers to an area within the UGB. *See Oregon's Statewide Planning Goals & Guidelines, Definitions* (defining "urban land" as "[l]and inside an urban growth boundary" and "urbanizable land" as a subset of "urban land").

Further, OAR 660-009-0015 requires an "economic opportunities analysis" in comprehensive plans, but only for the relevant "planning area," which is defined to mean "the area within an existing or proposed urban growth boundary." OAR 660-009-0005(7).

That understanding of Goal 9 is also consistent with ORS 197.712, the statute authorizing LCDC to adopt and implement goals and rules to facilitate economic development. As we explained in *Port of St. Helens v. LCDC*, 165 Or App 487, 494-95, 996 P2d 1014, *rev den*, 330 Or 363 (2000), Goal 9 carries out the requirements of ORS 197.712(2)(a) to (f), which require that comprehensive plans address economic development in a variety of ways (*e.g.*, analyze community economic patterns and potentials as they relate to state and national trends, provide for an adequate supply of land for industrial and commercial uses). In that case, the petitioners maintained that the statute "applies both inside and outside UGBs[.]" *Id.* at 494 (internal quotation marks omitted). We rejected that contention, explaining that, by its express terms, Goal 9 applies to "[c]omprehensive plans for urban areas" and that the "Goal 9 provision is well within LCDC's broad delegative authority to refine the statutory policy." *Id.* at 495.

In sum, even though Goal 9 pertains to the provision of "adequate opportunities throughout the state for a variety of economic activities," the specific requirements of the goal and its implementing rules apply only with respect to comprehensive plans that govern land inside urban growth boundaries. Thus, because land designated as either urban or rural reserves is outside of the UGB,[22] Goal 9 does not apply.

Second, the authorities on which Maletis relies to support his contention that Goal 9 applies in this context— *viz.*, OAR 660-027-0080(4) and ORS 197.175(2)—are simply inapposite. OAR 660-027-0080(4) requires that LCDC review the submittal for "[c]ompliance with the *applicable* statewide planning goals" (emphasis added), and ORS 197.175(2) requires counties and cities to prepare comprehensive plans

---

[22] *See* ORS 195.137(2) (defining "urban reserve," in part, as "lands outside an urban growth boundary"); ORS 195.141(2)(a) (providing that land that is designated as rural reserves "[m]ust be outside an urban growth boundary").

that are consistent with the goals. Neither the statute nor the rule makes Goal 9 applicable in this context.

For those reasons, LCDC did not err in concluding that Goal 9 does not apply to the designation. That conclusion obviates the need to consider Maletis's remaining contentions concerning Goal 9. Accordingly, we reject Maletis's fourth assignment of error.

2. *Use of Urban Growth Report to Project Land Needs (Goals 2 and 14)*

In its third assignment of error, petitioner MLG challenges Metro's use of the Urban Growth Report 2009-2030 to project growth and land needs. Specifically, MLG contends that, because Metro and the counties "projected land needs on a new report that was not incorporated within Metro's acknowledged functional plan and the acknowledged comprehensive plans of the Counties," LCDC erred in concluding that the submittal did not violate Goals 2 and 14. We have considered and reject that assignment of error without discussion.[23]

3. *Assessment of Carrying Capacity (Goals 2, 3, 4, 5, 6, 8, 9, 10, 12 and 14)*

In her first assignment of error, petitioner Graser-Lindsey contends that LCDC erred in concluding that Goals 2, 3, 4, 5, 6, 8, 9, 10, 12, and 14 do not require Metro and the counties to assess "carrying capacity"—that is, the "[l]evel of use which can be accommodated and continued without irreversible impairment of natural resources productivity, the ecosystem and the quality of air, land, and water resources," *Statewide Planning Goals & Guidelines, Definitions*—when designating urban and rural reserves. In response to Graser-Lindsey's objection pertaining to the assessment of "carrying capacity," LCDC essentially determined that, in light of the nature and effect of the reserves decision, "carrying capacity" simply cannot be meaningfully assessed and, for that reason, the assessment of carrying capacity does not apply to the designation decision.

_____

[23] Springville raised the same contentions as MLG. To the extent that those contentions are preserved, we also reject them without discussion.

Graser-Lindsey has failed to demonstrate why LCDC could not properly reach that conclusion.

## VI.   UNLAWFUL IN SUBSTANCE CONTENTIONS: "CONSIDERATION" AND "APPLICATION" OF THE RESERVE FACTORS AND THE MEANING AND APPLICATION OF THE "BEST ACHIEVES STANDARD"

Accordingly, we turn to petitioners' remaining contentions concerning whether LCDC's order is unlawful in substance. Although variously phrased and presented, those contentions all pertain to the final three transcendent matters described above, 261 Or App at 286-87:

(1)   The proper consideration and application of the urban and rural reserve factors, *see* 261 Or App at 293-311;

(2)   The meaning and application of the "best achieves standard," *see* 261 Or App at 311-18; and

(3)   LCDC's substantial evidence review, *see* 261 Or App at 347-63.

We address the contentions related to each of those matters, focusing first on the applicable legal principles and then on whether LCDC properly applied those principles in its review of Metro and the counties' submittal.

The bulk of those contentions are predicated, expressly or implicitly, on challenges to the correctness of one or more of nine legal premises undergirding LCDC's review of two interrelated matters—Metro and the counties' consideration and application of the reserve factors and their application of the "best achieves standard." Those contentions are essentially derivative variations on common themes. Accordingly, we begin by addressing the general "matter of law" correctness of LCDC's nine fundamental themes.

A.   *Validity of LCDC's Legal Premises: "Consideration" and "Application" of the Reserve Factors*

Upon considered review, we understand LCDC's reasoning concerning the proper "consideration" and "application" of the reserve "factors" to be predicated on the following five legal premises:

*First*, the urban and rural reserve factors are to be evaluated *in the manner of* the Goal 14 boundary location factors. Consequently: (1) the urban and rural reserve factors must be "applied"—that is, they must be employed or made use of; (2) the reserve "factors" are not independent approval criteria such that each factor must be satisfied before a designation may be made; and (3) "consideration" of the factors requires that Metro and the counties (a) apply and evaluate each factor, (b) weigh and balance the factors as a whole, *and* (c) meaningfully explain why a designation as urban or rural reserves is appropriate.

*Second*, Metro and the counties are to apply the reserve factors to *"areas"*—and not to individual properties or to the county or region as a whole.

*Third*, generally, Metro and the counties are to apply the factors to "alternative areas" within a county, as opposed to the entire region, to determine whether to designate them as urban or rural reserves. However, when Metro designates Foundation Agricultural Land as urban reserve, it must explain why it selected that land rather than other land within the regional study area that is not Foundation Agricultural Land.

*Fourth*, generally, Metro and the counties need not apply both the urban reserve factors and the rural reserve factors to each area in determining whether to designate it as urban or rural reserve. However, when Metro designates Foundation Agricultural Land as urban reserve, both sets of factors must be considered and applied.

*Fifth*, generally, if Metro and the counties properly consider and apply the factors, the decision whether to designate land as urban reserve or rural reserve or to leave the land undesignated is left to the local government. However, when Metro designates Foundation Agricultural Land as urban reserve, it must, after consideration of both sets of factors, explain why that land is more suitable as urban reserve than other land within the regional study area that is not Foundation Agricultural Land.

As noted, many of petitioners' contentions are predicated on the correctness of those five premises. Accordingly,

we address the general "matter of law" correctness of LCDC's premises in some detail.

### 1. *"Consideration" of "Factors" in the Manner of Goal 14*

In its order, LCDC explained that "OAR 660-027-0040(10) and (11), together with OAR 660-027-0050 (urban) and 660-027-0060 (rural), require [it] to review the submittal to determine whether Metro and the counties *considered and applied the factors* for urban and rural reserves." (Emphasis added.) In determining what it means to "consider and apply" the reserve factors, LCDC referred to a report authored by a DLCD analyst, Bob Rindy, that was submitted to LCDC during the rulemaking proceedings concerning the adoption of the division 27 rules.[24] That report described the recommendation of the workgroup that was formed after the enactment of SB 1011 to assist LCDC in drafting those rules. The workgroup's report elucidated the meaning of the term "consideration of factors" in designating urban and rural reserves:

"The workgroup discussed the term 'consideration of factors.' The proposed rules are based on the understanding that 'factors' are a special type of 'criteria' similar to the 'factors' proscribed for UGB location under Goal 14. As such, a general principle for Goal 14 factors applies here: factors are not 'independent criteria'—every parcel or area considered for urban or rural reserves would not be required to meet each and every factor. Instead, the factors are applied, weighed and balanced to select and evaluate areas for designation as urban or rural reserves. Metro and the counties must apply all the factors, not merely 'consider' them, and must use the factors to compare alternative locations for the reserves. *The group decided that the requirement to 'consider' the factors in the statute is not meant to imply that any factor may be simply 'considered but then disregarded'—all the factors must be considered, applied together (which also implies they must be 'balanced' in the manner of Goal 14), and Metro and [the] counties must demonstrate that they have done this.*

"The term 'consideration of factors' was previously adopted by LCDC in specifying the evaluation and selection of land

---

[24] The report was quoted extensively by LCDC in its acknowledgment order and is included as an attachment to that order.

for a UGB under Goal 14. Thus, there is precedent set by both LCDC and the courts regarding the interpretation and employment of 'factors.'[25] As indicated above, there was considerable discussion of the term 'factors' by the workgroup, including advice from LCDC legal counsel, and the group has concluded that 'factors' under SB 1011 are intended to be employed and interpreted *in the same manner* as the UGB factors in Goal 14."

(Emphasis added.)

LCDC essentially ratified the workgroup's understanding of the meaning of "consideration of factors." Specifically, LCDC explained that "consideration" and application of the "factors"

*"does not require a ranking, nor does it require that the 'best' suited lands be designated as either an urban or rural reserve, but it does require the county and Metro to show that they evaluated alternative areas in terms of each of the factors, 1000 Friends of Oregon v. Metro, 174 Or App 406, 409-10, 26 P3d 151 (2001) (Ryland Homes), and that their findings explain why each area's designation as an urban or rural reserve is appropriate. While the UGB amendment process requires more stringent evaluation of the factors, as in UGB amendment proceedings, the Commission concludes '[n]o single factor is of such importance as to be determinative* * * * *nor are the individual factors necessarily thresholds that must be met.' Citizens Against Irresponsible Growth v. Metro, 179 Or App [12, 17, 38 P3d 956 (2002)]. In other words as to any one area, the designating governmental body does not have to determine that the area complies with or meets every factor. The designating body considers*

---

[25] In particular, the workgroup referred to the following: OAR 660-024-0060(3) ("The boundary location factors of Goal 14 are not independent criteria. When the factors are applied to compare alternative boundary locations and to determine the UGB location, a local government must show that all the factors were considered and balanced."); *1000 Friends of Oregon v. Metro*, 174 Or App 406, 409-10, 26 P3d 151 (2001) (*Ryland Homes*); *Residents of Rosemont v. Metro*, 173 Or App 321, 328, 21 P3d 1108 (2001); and *Baker v. Marion County*, 120 Or App 50, 54, 852 P2d 254, *rev den*, 317 Or 485 (1993), *overruled on other grounds by Milne v. City of Canby*, 195 Or App 1, 96 P3d 1267 (2004).

The report acknowledged that the workgroup had relied on case law—*e.g.*, *Ryland Homes* and *Residents of Rosemont*—decided before LCDC's amendment of Goal 14, which had generally become effective in April 2006. However, the report explained that, "although the amended goal includes fewer factors than the original, the intent and operation of [the] factors was not intended to change under the amended goal."

*the factors together, and weighs and balances the factors as a whole."*

(Footnote omitted; first brackets and omission in LCDC's order; emphasis added.) Thus, consistently with the rulemaking history—which itself was predicated on statutory context and function—LCDC concluded that "consideration" of the urban and rural reserve "factors" requires that Metro and the counties evaluate the factors *in the same manner* that boundary location factors of Goal 14 are evaluated. For the reasons that follow, LCDC's construction is correct.

Although incorporated by LCDC into its division 27 rules, the concept of "consideration" of "factors" derives from the governing statutes. To determine the meaning of those terms, we adhere to the methodology described in *PGE v. Bureau of Labor and Industries*, 317 Or 606, 859 P3d 1143 (1993), as amplified in *State v. Gaines*, 346 Or 160, 206 P3d 1042 (2009). In general, that means that "we examine the text and context of the statute and any legislative history that appears to be helpful * * *." *Bell v. Tri-Met*, 353 Or 535, 540, 301 P3d 901 (2013).

As previously described, 261 Or App at 271-72, at the time SB 1011 was enacted, a process existed for the designation of urban reserves under the division 21 rules. In general terms, that preexisting process required the examination of the suitability of land for designation as urban reserve through the lens of the Goal 14 boundary location factors and a set of priorities that focused on the agricultural quality of the land. *Id.* That is, there was—and is—congruence between the requirements for designating land as urban reserve under the division 21 rules and the requirements in Goal 14 and ORS 197.298 that are employed when amending a UGB.

Through its enactment of SB 1011, the legislature created a new, alternative process for the designation of urban reserves. *See* ORS 195.145(1)(b) (authorizing designation of urban reserves); ORS 195.145(5) (providing factors for consideration when designating urban reserves under ORS 195.145(1)(b)). As Representative Dingfelder explained,

this "new process for designating urban reserves" is "based on a set of factors that consider how well land can be woven into the urban fabric of the region rather than the current approach of selecting urban reserves based on factors that are related to their quality as farm land." Audio Recording, House Floor Debate, SB 1011, June 11, 2007, at 1:48:58 - 1:49:30 (statement of Rep Dingfelder), https://olis.leg.state. or.us (accessed Feb 6, 2014).

Unlike the division 21 process, the new statutory process for designating urban reserves does not expressly incorporate the Goal 14 factors or a priorities hierarchy. Although there is some conceptual similarity between the Goal 14 boundary location factors and the urban reserve factors in ORS 195.145(5), those two sets of factors are not worded similarly. Moreover, as noted, the legislative history of SB 1011 clearly demonstrates that the urban reserve factors in ORS 195.145(5) were not derived from Goal 14—but, instead, originated from the Ag-Urban Study process generally and the Great Communities Report specifically. *See* 261 Or App at 270-71, 270 n 5. In sum, the urban reserve factors in ORS 195.145(5) and the Goal 14 boundary location factors are not *congruent*. Nevertheless, for reasons that we will explain, LCDC did not err in concluding that the legislature intended that the urban and rural reserve factors should be considered *"in the manner of"* the Goal 14 boundary location factors.[26]

Although the legislature required that Metro and a county base the designation of urban reserves and rural reserves on the "consideration" of separate sets of "factors,"[27] those terms are undefined. The ordinary meaning of

---

[26] At one point in its order, LCDC noted that the urban reserve "factors derive from the Goal 14 locational factors." Nevertheless, consistently with the rulemaking history on which LCDC relied, we understand LCDC's statement to mean that the factors should be evaluated *in the same manner* as the boundary location factors of Goal 14.

[27] *See* ORS 195.145(5) (providing that "[Metro] and a county shall base the designation of urban reserves under subsection (1)(b) upon *consideration* of [a nonexclusive list] of factors" (emphasis added)); ORS 195.141(3) (providing that "a county and [Metro] shall base the designation [of rural reserves] on *consideration* of [a separate nonexclusive list] of factors" (emphasis added)).

"consideration" includes "the act of regarding or weighing carefully," *Webster's Third New Int'l Dictionary* 484 (unabridged ed 2002), and the ordinary meaning of "factor" includes "something (as an element, circumstance, or influence) that contributes to the production of a result * * * <such ~s as availability of adequate power, transportation, and a labor source must be considered in appraising an industrial site>," *id.* at 813. Those abstract and generic definitions provide limited guidance concerning the particular meaning and employment of the terms "consideration" and "factors" in this context. Further, the legislative history does not provide explicit direction.

Nevertheless, in the order on review, LCDC correctly reasoned that, because "consideration of factors" has a particular meaning in related land use contexts, the legislature intended for it to have the same meaning here. Specifically, as explained above, 261 Or App at 295-96, LCDC ratified the workgroup's view that, because the term "consideration of factors" had been previously used by LCDC and the courts in the related Goal 14 context and there had been "precedent set by both LCDC and the courts regarding the interpretation and employment of 'factors,'" the urban and rural reserve "factors" "under SB 1011 are intended to be employed and interpreted *in the same manner* as the UGB factors in Goal 14." (Emphasis added.)

Consistently with that legislative intent, LCDC referred to our precedents addressing the application of the Goal 14 boundary location factors to determine the legal principles circumscribing the "consideration of factors" in this context. To that end, LCDC identified three pertinent principles from our decisions in *Ryland Homes* and *Citizens Against Irresponsible Growth.*

First, the factors are to be "applied" by Metro and the counties in evaluating and selecting land to designate as urban or rural reserve. In other words, in making its decisions, Metro and the counties must actually make use of—or employ—the factors. *See generally Ryland Homes,* 174 Or App at 408 (concerning, in part, whether Metro

properly applied the boundary location factors of Goal 14); *see also Webster's* at 105 (defining "apply" to mean, among other things, "to make use of as suitable, fitting, or relevant <~ the rule to each situation>" and "to put to use esp. for some practical purpose <~ knowledge>").

Second, the urban and rural reserve "factors" are not independent approval criteria such that each factor must be satisfied before a designation may be made. *See Ryland Homes*, 174 Or App at 409 (noting that the Goal 14 "locational factors are not independent approval criteria"); *Citizens Against Irresponsible Growth*, 179 Or App at 17 (reasoning that "[n]o single [Goal 14] factor is of such importance as to be determinative in a UGB amendment proceeding, nor are the individual factors necessarily thresholds that must be met"; explaining that "Metro properly did not apply the factors individually as make-or-break mandatory approval criteria").

Third, "consideration" of the factors requires that the local government (a) apply and evaluate each factor, (b) weigh and balance the factors as a whole, and (c) meaningfully explain why a designation as urban or rural reserves is appropriate. As we succinctly explained in *Ryland Homes*, "consideration" means that a local government "has an obligation to consider each of the [applicable] factors and to articulate its thinking regarding the factor and the role that each factor played in balancing all of the factors." 174 Or App at 416.

In sum, the new, alternative process of designating urban and rural reserves at issue here was not intended to be "congruent" with the process of designating urban reserves under the division 21 rules or the process of amending a UGB under ORS 197.298 and Goal 14. Had that been the intention, the new, alternative process developed in SB 1011—and embodied in the statutes at issue in this case—would not have been functionally new and different. Nevertheless, relying on the statute's text and context, LCDC correctly reasoned that, when designating urban reserves under ORS 195.145(1)(b) and rural reserves under ORS 195.141, the statutory term "consideration of factors" means that the reserve factors are to be considered *in the manner of* the boundary location factors of Goal 14. In other words,

Metro or a county must (a) apply and evaluate each factor, (b) weigh and balance the factors—which are not independent approval criteria—as a whole, and (c) meaningfully explain why a designation as urban or rural reserves is appropriate.

## 2. *Application of the Factors to "Areas"*

Having determined the meaning of "consideration" of the urban and rural reserve "factors," LCDC turned its attention to a subsidiary issue—that is, the appropriate unit of land to which the factors are to be applied—and concluded "that [the] division 27 [rules] require[] Metro and the counties to apply the factors *to areas, not to individual properties, and not to the entire region*." (Emphasis added.) Specifically, LCDC reasoned:

"[The Goal 14 locational] factors are applied to alternative locations for expanding an urban growth boundary to decide which one(s) to select to include within the expanded UGB. [*Ryland Homes*], 174 Or App at 417. Similarly, under the Commission's division 21 urban reserve rules, the Goal 14 factors are applied to proposed urban reserve areas. *D. S. Parklane Development, Inc. v. Metro*, [165 Or App 1, 994 P2d 1205 (2000) (*Parklane*)]. The Commission intends, and construes that the legislature intended, that in deciding which lands to designate as urban and rural reserves, Metro and the counties are to apply the factors to selected areas to decide which ones to include as urban reserves, and which areas to include as rural reserves. Furthermore, because SB 1011 and division 27 require Metro and a county to jointly decide upon urban and rural reserves, the factors are applied to alternative areas within a county to decide which ones to designate as urban or rural reserves.

"OAR 660-027-0040(10) requires Metro and the counties to 'adopt a single, joint set of findings of fact, statements of reasons and conclusions explaining why *areas* were chosen as urban or rural reserves, how these designations achieve the objective stated in OAR 660-027-0005(2), and the factual and policy basis for the estimated land supply determined under section (2) of this rule.' (Emphasis added.) The rule specifically requires Metro and the counties to apply the factors to 'areas' rather than specific properties or to the region or a county as a whole. OAR 660-027-0040(11) expands the requirements of OAR 660-027-0040(10) by requiring Metro to make additional

findings if it designates 'Foundation Agricultural Land,' as defined in OAR 660-027-0010(1), as urban reserves. The findings and statement of reasons required under subsection (11) for Foundation Agricultural Lands do not alter the geographic unit that Metro and the counties must adopt findings for—the findings must still be by 'area' rather than on a property-by-property or region-wide basis. What this means is that if Metro designates some portion or all of an area as urban reserve, and that area includes Foundation Agricultural Land, then the joint findings must explain why the area was selected as an urban reserve by applying both the urban and rural factors to that area and explaining why that area is more suitable as an urban reserve than other lands within Metro's study area that are not Foundation Agricultural Lands."

Unlike the meaning of "consideration of factors," which derived from the governing statutes, the correctness of the remaining legal premises underlying LCDC's reasoning are predicated on LCDC's interpretation of its division 27 rules that were promulgated to implement the statutes governing the designation of urban and rural reserves in this case. As we have previously explained, the governing statutes created a new process for the designation of suitable land as urban and rural reserves. To that end, the governing statutes require that the designation of urban reserves under ORS 195.145(1)(b) be based on the "consideration of factors" in ORS 195.145(5) and that the designation of rural reserves under ORS 195.141 be based on the "consideration of factors" in ORS 195.141(3). The statutes further require intergovernmental coordination and cooperation. Beyond that, however, the legislature authorized LCDC to "adopt by goal or by rule a process and criteria for designating" the reserves at issue in this case. ORS 195.141(4); ORS 195.145(6). Thus, the particulars of that process are embodied in LCDC's division 27 rules.

We will defer to LCDC's "plausible interpretation of its own rule[s], including an interpretation made in the course of applying the rule, if that interpretation is not inconsistent with the wording of the rule, its context, or any other source of law." *DeLeon, Inc. v. DHS*, 220 Or App 542,

548, 188 P3d 354 (2008) (citing *Don't Waste Oregon Com. v. Energy Facility Siting*, 320 Or 132, 881 P2d 119 (1994)); *see also 1000 Friends of Oregon v. LCDC (Lane Co.)*, 305 Or 384, 390, 752 P2d 271 (1988) (explaining that the legislature's entrustment of an agency "both with setting standards and with applying them can imply that the agency's view of its standards (assuming that they are within their authorizing law and consistently applied) is to be given some appropriate respect by the courts"). For reasons that we will explain, LCDC's interpretation of its rules to require that Metro and the counties apply the factors to "areas"— sometimes referred to as "study areas"—as opposed to specific properties or a county or the region as a whole is plausible.

In concluding that its rules require that the factors be applied to "areas," LCDC pointed to the requirement in OAR 660-027-0040(10) that Metro and the counties "shall adopt a single, joint set of findings of fact, statements of reasons and conclusions explaining," *inter alia*, "why *areas* were chosen as urban or rural reserves." (Emphasis added.) According to LCDC, the use of the term "areas" in that rule evinces *its* intent that Metro and the counties apply the reserve factors to "areas" and then explain why particular "areas" were chosen as urban or rural reserves. Further, LCDC noted that factors are applied to "areas"—as opposed to other units of land—in related contexts. *See Parklane*, 165 Or App at 9-10 (describing the use of "areas" to determine the suitability of land for designation as urban reserves under the division 21 rules); *see also City of West Linn v. LCDC*, 201 Or App 419, 425, 119 P3d 285 (2005) (*West Linn*) (describing the use of "areas" to determine the suitability of land for inclusion within an amended UGB); *Residents of Rosemont v. Metro*, 173 Or App 321, 324-25, 21 P3d 1108 (2001) (same).

LCDC's interpretation of OAR 660-027-0040(10) is not inconsistent with the pertinent statutes or other division 27 rules. Nothing in the statutes prohibits Metro and the counties from employing "areas" as the unit of land to which the factors are to be *applied* or expressly requires the

*application* of the factors to specific properties or a county or the region as a whole.[28]

Moreover, LCDC's interpretation of OAR 660-027-0040(10) is not inconsistent with the pertinent statutes or other division 27 rules that define urban and rural reserves as "land" or "lands" and require that Metro and the counties base the designation of reserves on "consideration" of factors as to the "land" proposed for designation.[29] That is so because, as LCDC noted in its order, a "portion * * * of an area" may be designated as urban or rural reserve. In other words, in applying its rules, LCDC recognized that, even though the factors are *applied* to "areas" and the justification for the designation of land is framed in terms of those "areas," an entire "area" need not be *designated* as either urban or rural reserve.

The distinction between the application of factors to "areas" and the designation of "land" is significant because, as to the latter, the governing statutes require that Metro and the counties base their designations on consideration of the reserve factors. As noted, consistently with the division

---

[28] We note that "land" is ordinarily defined to mean "the solid part of the surface of the earth in contrast to the water of oceans and seas," *Webster's* at 1268, and "area," *inter alia,* means "an expanse or tract of the earth's surface," *id.* at 115. In other words, "area" is simply a unit of "land."

[29] *See* ORS 195.137(1) (providing, in part, that "'[r]ural reserve' means *land*" (emphasis added)); ORS 195.137(2) (providing, in part, that "'[u]rban reserve' means *lands*" (emphasis added)); ORS 195.141(3) (providing, in part, that "a county and [Metro] shall base the designation on consideration of factors including, but not limited to, whether *land* proposed for designation as a rural reserve: [factors omitted]" (emphasis added)); ORS 195.145(5) (providing, in part, that "[Metro] and a county shall base the designation of urban reserves under [ORS 195.145(1)(b)] upon consideration of factors including, but not limited to, whether *land* proposed for designation as urban reserves alone or in conjunction with *land* inside the [UGB]: [factors omitted]" (emphasis added)); *see also* OAR 660-027-0010(9) (providing, in part, that "'[r]ural reserve' means *lands*" (emphasis added)); OAR 660-027-0010(11) (providing, in part, "'[u]rban reserve' means *lands*" (emphasis added)); OAR 660-027-0050 (providing, in part, "Metro shall base its decision on consideration of whether *land* proposed for designation as urban reserves, alone or in conjunction with *land* inside the UGB: [factors omitted]" (emphasis added)); OAR 660-027-0060(2) (providing, in part, that "a county shall base its decision on consideration of whether the *lands* proposed for designation [as rural reserves intended to provide long-term protection to the agriculture or forest industry, or both]: [factors omitted]" (emphasis added)); OAR 660-027-0060(3) (providing, in part, that "a county must consider those areas identified in [the Natural Landscape Features Inventory] and other pertinent information, and shall base its decision on consideration of whether *lands* proposed for designation: [factors omitted]" (emphasis added)).

27 rules, Metro and the counties identified "areas" that they used to study the land. There is no reviewable challenge in this case concerning the use of "areas" *per se* or the legal permissibility of the initial inclusion of land within a particular "study area." Instead, we are confronted with challenges by landowners contending that their "land" was improperly designated as urban or rural reserves solely because of its inclusion within an "area" that was similarly designated. The gravamen of those challenges is that Metro and the counties inadequately considered the reserve factors with regard to the land that was actually designated as either urban or rural reserves.[30] Resolution of those challenges requires an examination of the adequacy of the local government's consideration of the factors as to the "land" that was ultimately designated under the standards described above. 261 Or App at 298-301 (describing "consideration").

In other words, when a landowner contends that his or her property was improperly designated as urban or rural reserves solely because of its inclusion within an "area," our task is to determine whether LCDC properly determined that the local government adequately considered the factors in making the designation that included that land. As we have explained, 261 Or App at 300-01, 303-05, legally sufficient "consideration" requires that the local government meaningfully explain why a designation as urban or rural reserves is appropriate by reference to the totality of the land encompassed within that designation. In that regard, to the extent that a property owner challenges the inclusion of his or her property within a designated area, the local

---

[30] We understand that the legislature intended for such challenges to be cognizable on review. Our understanding is predicated, in part, on the following exchange that occurred during the floor debate of SB 1011 in the Senate:

Senator Frank Morse:  "[Rural reserves] appears to be a lockout for 40 years so that, if a property is not included in the urban reserve, is it then locked out for 40 years?"

Senator Brad Avakian:  "* * * I think your interpretation is possibly correct. I would add to that that it is possible if an adverse decision is made regarding somebody's intended use of their property that there is an appeals process to the LCDC and then beyond that to the Oregon Court of Appeals."

Audio Recording, Senate Floor Debate, SB 1011, May 10, 2007, at 38:48 - 39:38, https://olis.leg.state.or.us (accessed Feb 6, 2014).

government is obligated to have explained why its consideration of the factors yields, as to the totality of the designated land, a result that includes that property.

In sum, LCDC's interpretation of its rules to require Metro and the counties to *apply* the factors to "areas" as opposed to specific properties or a county or the region as a whole and to frame their justification for the designation of land in terms of those "areas" is plausible and is not inconsistent with the division 27 rules in context or with any other source of law. Accordingly, we defer to it.

3. *Application of the Factors to Alternative Areas within a County*

In explaining that the factors are to be applied to "areas," 261 Or App at 301-06, LCDC also concluded that, generally, Metro and the counties must apply the factors "to alternative areas *within a county* to decide which ones to designate as urban or rural reserves." (Emphasis added.) In reaching that conclusion, LCDC relied on its rules that require Metro and *a* county to jointly designate reserves.[31] (Emphasis added.)

However, LCDC recognized that, when Metro designates Foundation Agricultural Land as urban reserves, a different alternative lands analysis is required. Specifically, OAR 660-027-0040(11) provides, in part, that,

---

[31] *See* OAR 660-027-0020(2) ("A county may designate rural reserves through intergovernmental agreement with Metro and by amendment of its comprehensive plan to implement such agreement in accordance with the requirements of this division."); OAR 660-027-0020(3) ("A county and Metro may not enter into an intergovernmental agreement under this division to designate urban reserves in the county unless the county and Metro simultaneously enter into an agreement to designate rural reserves in the county."); *see also* ORS 195.143(1) (providing that "[a] county and [Metro] must consider simultaneously the designation and establishment of" urban reserves under ORS 195.145(1)(b) and rural reserves under ORS 195.141); ORS 195.143(2) (providing that "[a]n agreement between a county and [Metro]" to establish urban reserves pursuant to ORS 195.145(1)(b) and rural reserves "must provide for a coordinated and concurrent process for adoption by the county of comprehensive plan provisions and by [Metro] of regional framework plan provisions to implement the agreement); ORS 195.143(3) ("A county and [Metro] may not enter into an intergovernmental agreement to designate urban reserves in the county pursuant to ORS 195.145(1)(b) unless the county and [Metro] also agree to designate rural reserves in the county.").

"if Metro designates [Foundation Agricultural Land] as urban reserves, the findings and statement of reasons [in OAR 660-027-0040(10)] shall explain, by reference to the factors in OAR 660-027-0050 and 660-027-0060(2), why Metro chose the Foundation Agricultural Land for designation as urban reserves *rather than other land considered under this division.*"

(Emphasis added.) LCDC interpreted the italicized provision of that rule to mean that,

"if Metro designates some portion or all of an area as an urban reserve, and that area includes Foundation Agricultural Land, then the joint findings must explain why the area was selected as an urban reserve by applying both the urban and rural factors to that area and explaining why that area is more suitable as an urban reserve than *other lands within Metro's study area that are not Foundation Agricultural Lands.*"

(Emphasis added.)

In sum, LCDC concluded that, generally, Metro and the counties are to apply the factors to "alternative areas" *within a county* but that, when Metro designates Foundation Agricultural Land as urban reserve, it must explain why it selected that land rather than other land *within the regional study area* that is not Foundation Agricultural Land. That conclusion is essentially predicated on LCDC's interpretation of its division 27 rules. Because that interpretation is "plausible" and "not inconsistent with the wording of the rule[s], [their] context, or any other source of law," we defer to it. *DeLeon, Inc.*, 220 Or App at 548 (citing *Don't Waste Oregon Com.*, 320 Or 132).

Without belaboring the point, LCDC's interpretation of its implementing rules is not inconsistent with the governing statutes, which do not prescribe any particular alternatives analysis. Moreover, LCDC's interpretation of OAR 660-027-0040(11) to impose more stringent requirements when evaluating and designating Foundation Agricultural Land as urban reserve is consistent with one of the underlying purposes of SB 1011—*viz.*, making it easier to urbanize land that is not necessarily critical to the long-term viability of the agricultural industry while at the

same time providing long-term protection to lands that are critical.[32]

4. *Application of Rural Reserve Factors, Urban Reserve Factors, or Both to Each Area*

LCDC's interpretation of OAR 660-027-0040(11) also played a role in its determination of whether OAR 660-027-0040(10) requires that both sets of factors be applied to every area. As pertinent to that issue, OAR 660-027-0040(10) provides that "Metro and any county that enters into an agreement with Metro under this division shall apply the factors in OAR 660-027-0050 [(*i.e.*, the urban reserve factors)] and 660-027-0060 [(*i.e.*, the rural reserve factors)] *concurrently and in coordination with one another.*" (Emphasis added.)

Relying in part on the juxtaposition of OAR 660-027-0040(10) with OAR 660-027-0040(11)—and contrasting the content of those subsections—LCDC concluded that the "concurrently and in coordination" requirement in OAR 660-027-0040(10) "does not require both urban and rural reserve factors to be considered for each and every property, or for each and every area." Specifically, LCDC reasoned:

"The Commission interprets the 'simultaneous consideration' requirement in OAR 660-027-0040(1[0]) to mean that the county and Metro must consider urban and rural reserve designations in the entire county and region at the same time and adopt a single, joint set of findings, reasons and conclusions for its designations. It does not imply any particular outcome and does not require both urban and rural reserve factors to be considered for each and every property, or for each and every area. In contra[s]t, in OAR 660-027-0040(11), [LCDC] has expressly required that if

---

[32] *See* ORS 195.137(1) (providing, in part, that "'rural reserve' means land reserved to provide long-term protection for agriculture, forestry or important natural landscape features * * *"); *see also* Audio Recording, House Floor Debate, SB 1011, June 11, 2007, at 1:48:58 - 1:49:40 (statement of Rep Dingfelder, indicating that the new process for designating urban reserves is "based on a set of factors that consider how well land can be woven into the urban fabric of the region rather than the current approach of selecting urban reserves based on factors that are related to their quality as farm land. In effect, this will make it easier to urbanize land that may have good soil but is not necessarily critical to the agricultural economy."), https://olis.leg.state.or.us (accessed Feb 6, 2014); *id.* at 1:49:47 - 1:50:01 (statement of Rep Dingfelder, explaining that, *inter alia*, rural reserves "are the lands that are critical to the functioning and long-term viability of the agricultural industry irrespective of soil quality").

Metro designates Foundation Agricultural Land as urban reserves, it must explain under both the urban and rural reserve factors why such land was chosen. Thus, the context of the regulatory scheme establishes that a requirement to apply both urban and rural reserve factors to a particular [area] will be expressly stated."

In other words, we understand LCDC to have concluded that the "concurrently and in coordination" requirement in OAR 660-027-0040(10) refers to the *overall* process of designating reserves and requires that Metro and the counties concurrently consider the designation of both urban and rural reserves in coordination with one another. Stated differently, except when Foundation Agricultural Land is involved, the "concurrently and in coordination" requirement does not mean that both urban and rural reserve factors must be applied to every area.

LCDC's interpretation of the "concurrently and in coordination" requirement of OAR 660-027-0040(10) appears to be its reflection of the statutory mandate in ORS 195.143(1), which requires that Metro and a county "must consider simultaneously the designation and establishment" of rural reserves pursuant to ORS 195.141 and urban reserves pursuant to ORS 195.145(1)(b).[33] Further, although ORS 195.145(5) and ORS 195.141(3) require that Metro and a county base the designation of urban reserves on consideration of one set of factors and the designation of rural reserves on another set of factors, nothing in those statutes requires that the both sets of factors be applied to land before designating it as either urban or rural reserves. Because that interpretation is plausible and not inconsistent with the text or context of the rule or the governing statutes, we defer to it. *See DeLeon, Inc.*, 220 Or App at 548.

5. *Determination Whether to Designate an Area As Urban or Rural Reserves or to Leave It Undesignated*

Finally, LCDC concluded that, if Metro and the counties properly consider and apply the factors, the decision

---

[33] *See also* Testimony, House Committee on Energy and the Environment, SB 1011, May 21, 2007, Ex C (statement of Randy Tucker) ("Because it is important that urban and rural reserves be addressed concurrently, SB 1011 creates a process for designating them simultaneously through agreements between Metro and the counties.").

whether to designate particular land as urban reserves or rural reserves or to leave it undesignated is left to the local government. In particular, LCDC concluded that, even though "many areas could have been[] designated either as an urban or rural reserve," the division 27 rules and the governing statutes "grant substantial discretion to Metro and the counties in deciding which lands to designate as urban and rural reserves" and that, except when Metro designates Foundation Agricultural Land as urban reserve, if the factors are properly considered and applied, the statutes and rules do not require a demonstration "that an area is better suited as an urban reserve than as a rural reserve before [Metro] designates any land as urban reserve." With regard to Metro's designation of Foundation Agricultural Land as urban reserve, LCDC interpreted OAR 660-027-0040(11) to require that "the joint findings * * * explain" why the Foundation Agricultural Land "is *more suitable* as an urban reserve than other lands within Metro's study area that are not Foundation Agricultural Lands." (Emphasis added.)

LCDC's understanding is again unexceptionable. The governing statutes provide that Metro and a county *may* enter into intergovernmental agreements to designate reserves and require that Metro and a county base the designation of urban reserves on consideration of one set of factors and the designation of rural reserves on another and that, if urban reserves are designated, some rural reserves must be designated as well. The statutes do not, however, require the designation of particular land as urban or rural reserve or a determination of *relative* suitability—that is, a determination that land that is suitable for both urban and rural reserve designation is better suited as urban reserve before Metro designates it as such. Accordingly, because LCDC's interpretation of its rules is plausible and not inconsistent with their text or context or with the governing statutes, we, once again, defer to it.

In sum, we conclude that the five fundamental legal premises undergirding and informing LCDC's review of the consideration and application of the reserve factors are individually and collectively valid. We turn, then, to the

four premises informing LCDC's review of the meaning and application of the "best achieves standard."

B.  *Validity of LCDC's Legal Premises: The "Best Achieves Standard"*

As noted, 261 Or App at 276-77, the "best achieves standard" was established by LCDC in OAR 660-027-0005(2). Specifically, that rule provides, in pertinent part, that

> "[t]he objective of this division is a balance in the designation of urban and rural reserves that, *in its entirety,* **best achieves** livable communities, the viability and vitality of the agricultural and forest industries and protection of the important natural landscape features that define the region for its residents."

(Emphasis and boldface added.)

The construction and application of that rule was central to LCDC's review of the submittal. As amplified below, we understand LCDC's reasoning concerning the meaning and employment of the best achieves standard in OAR 660-027-0005(2) to be predicated on the following four legal premises:

*First,* the best achieves standard is a qualitative standard rather than a quantitative one.

*Second,* the standard applies to Metro and the counties' joint designation "in its entirety" and not to the designation of individual properties or areas.

*Third,* the best achieves standard allows for a range of permissible designations.

*Fourth,* Metro and the counties must explain how the designation satisfies the best achieves standard through their findings concerning the application of the urban and rural reserve factors.

Again, because many of petitioners' contentions on review are predicated, expressly or implicitly, on challenges to the correctness of one or more of those four premises, we begin by addressing the correctness, as a matter of law, of those four premises—all of which are predicated on LCDC's

interpretation of its division 27 rules, including OAR 660-027-0005(2). Accordingly, we will defer to LCDC's interpretation of its rules if it is "plausible" and "is not inconsistent with the wording of the rule[s], [their] context, or any other source of law." *DeLeon, Inc.*, 220 Or App at 548.

1. *Standard Is Qualitative Not Quantitative*

In the order on review, LCDC reasoned that OAR 660-027-0005(2) requires "a qualitative balance in terms of long-term trade-offs between the further geographic expansion of the Portland metro urban area and the conservation of farm, forest and natural areas that surround the metro area." In other words, in LCDC's understanding, "[t]his is not a balance in terms of the quantitative amount of urban and rural reserves, but a balance between encouraging further urban expansion versus land conservation."

As support for that interpretation, LCDC referred to a transcript of a January 2008 hearing concerning the adoption of the division 27 rules. During that hearing, Commissioner Worrix, who chaired the workgroup that considered the adoption of the division 27 rules, explained that, "even though there was an attempt to keep the process fluid some people felt there just simply was not enough direction and there wasn't a measurement of any kind." She explained that the best achieves standard was seen as "the best solution" for the agricultural industry that had expressed "a strong concern * * * that there needed to be something that highlighted the importance of foundation land and gave them that little extra bit of scrutiny." In sum, according to Worrix, the work group intended the best achieves standard "to serve as a guidepost" that reflected "the overall objective * * * to create a process that was consensus building and a product that was a balance of protecting farm, forest and natural landscapes at the same time creating livable communities."

To that end, the best achieves standard expressly requires the balancing of three competing objectives that underscore the designation of urban and rural reserves under the division 27 rules—that is, "livable communities, the viability and vitality of the agricultural and forest

industries and protection of the important natural landscape features that define the region for its residents." OAR 660-027-0005(2). Those objectives are qualitative in nature. Moreover, nothing in the text of OAR 660-027-0005(2)—or the division 27 rules generally—suggests that there must be a quantitative balance in the amount of land designated as urban reserves and the amount of land designated as rural reserves.

Thus, LCDC's interpretation of the best achieves standard to require a qualitative balance between urban expansion and conservation is plausible and is not inconsistent with the text of OAR 660-027-0005(2), its context, or any other source of law. Accordingly, we defer to it.

2. *Standard Applies to Designation "In Its Entirety" Not to Designation of Individual Properties or Areas*

LCDC also construed the best achieves standard as applying to the designation "in its entirety" and not to the designation of individual properties or areas. LCDC's interpretation is consistent with Worrix's statements at the January 2008 rulemaking hearing as well as the report that Rindy submitted to LCDC before that hearing—described above at 261 Or App at 295. In that report, Rindy noted that the workgroup "agreed that the 'best' standard applies to the designation 'in its entirety,' rather than to individual areas or parcels."

Suffice it to say, by its terms, the best achieves standard applies to the designation "in its entirety." Nothing in the text of the rule—or its enactment history—suggests that it was intended to apply to the designation of individual properties or areas as urban or rural reserve. Rather, as we have described, 261 Or App at 293-311, Metro or a county's decision to designate particular land as urban or rural reserve is governed by other provisions under division 27. *See generally* OAR 660-027-0040(8) - (11) (concerning the application of the urban and rural reserve factors in determining whether to designate land as urban or rural reserves).

Thus, LCDC's interpretation of the best achieves standard to apply to the designation "in its entirety"—as

opposed to the designation of individual properties or areas—is plausible and is not inconsistent with the text and context of OAR 660-027-0005(2) or any other source of law. *DeLeon, Inc.*, 220 Or App at 548 (citing *Don't Waste Oregon Com.*, 320 Or 132). Again, we defer to it.

    3.  *"Best Achieves Standard" Allows for a Range of Permissible Regional Designations*

    LCDC further reasoned that the best achieves standard does not require a ranking of alternative areas. Specifically, LCDC explained:

> "In adopting division 27, the Commission intended that this 'best achieves' standard would require less scrutiny for the reserves decision than the requirements for locational decisions involved in urban growth boundary expansions (to consider and apply factors to alternative candidate areas ***). The standard applies to the designation 'in its entirety,' it does not require Metro or a county to rank alternative areas. ***

> "*** The Commission interprets the standard to apply in such a manner that concerns about one or more areas could result in a determination that the standard is not met (*i.e.*, the submittal in its entirety could fail to meet this standard because of problems with one or more particular designations)."

It follows from LCDC's construction that, because the best achieves standard "does not require Metro or a county to rank alternative areas," the standard is not satisfied by a single, optimal designation. Instead, under LCDC's reasoning, the standard allows for a range of permissible designations.

    At first blush, LCDC's understanding appears contrary to the plain meaning of the word "best." As we have noted, the best achieves standard in OAR 660-027-0005(2) requires "a balance in the designation of urban and rural reserves that, in its entirety, *best achieves*" the competing objectives underlying the designation of such reserves. (Emphasis added.) In that context, the word "best" is a superlative of the adverb "well" and connotes a designation that achieves the underlying objectives to the highest degree or the fullest extent. *See Webster's* at 208 (defining "best" to mean, among other things, "to the highest degree :

to the fullest extent"). Stated differently, the plain meaning of the word "best" suggests that a comparative alternatives analysis is required to determine the highest ranked—and therefore the "best" designation.

Nevertheless, LCDC endorsed a different construction of its own rule, based primarily on the function of the best achieves standard in the context of the statutory scheme and the division 27 rules as whole. As noted, the division 27 rules implement the governing statutes, which established a new, alternative process under which Metro and a county may designate suitable land as urban and rural reserves based on their consideration of factors rather than on the application of a priorities hierarchy essentially predicated on the agricultural quality of land.

Consistently with the enabling statutes, the division 27 rules permit Metro and a county to determine which land is suitable for designation as urban or rural reserve. In particular, the rules permit Metro and a county to enter into an intergovernmental agreement to designate urban and rural reserves in that county. Further, the rules generally require that, in designating such reserves, Metro and the county must apply the reserve factors to *alternative areas* within a county to determine whether and how to designate land. *See* 261 Or App at 306-07 (describing alternatives analysis).

Ultimately, the designations made by Metro and each county with which it has entered into an agreement are compiled into a single, joint designation that is submitted to LCDC for its review. The best achieves standard applies to that regional designation of urban and rural reserves in its entirety.

In light of that regulatory scheme, LCDC construed the best achieves standard to allow for a range of permissible regional designations, rather than to require a comparative analysis so as to identify a *single*, permissible—that is, "optimal"—designation. In other words, consistently with the statutory design and the concomitant consideration of the reserve factors, "best achieves" partakes of legally circumscribed discretion such that Metro and the counties can properly reach a range of joint, regional designations.

LCDC's construction of the best achieves standard is consistent with appellate decisions addressing the concept of discretion in a variety of contexts. Those cases demonstrate that the essence of discretion requires the decision-maker—as opposed to a reviewing agency or court—to resolve evidentiary conflicts and draw inferences consistent with the record and to ultimately weigh and apply the various factors in reaching its ultimate decision. *See, e.g.*, *Sjomeling v. Lasser*, 251 Or App 172, 285 P3d 1116, *rev den*, 353 Or 103 (2012) (explaining that "best interests" of the child is a discretionary standard).

Further, LCDC's construction essentially ratified the workgroup's understanding of the standard. As Rindy noted in his report, the best achieves standard was "not intended to necessitate a numeric 'ranking' of alternatives for reserve designation in order to determine the highest ranked, and therefore 'the best' alternative." Further, Worrix explained:

> "[I]t's important to recognize that the workgroup never saw that best requirement as being something that would require a detailed parcel to parcel type analysis. And there was real worry that it would even be construed that way because that was the opposite of the kind of fluid creative process we were hoping to be able to create. And that instead of being a process that would require exactitude found in like a parcel to parcel comparison that this best concept is supposed to focus on the collective overall regional process. It would be looking for the best fundamental balance between the competing areas. [I]t would not require a ranking best, second best, third best it's much more general than that. *** [T]his process was never designed to be did you touch all the bas[e]s, did you double check all your maps, did you calculate the right area on this particular parcel. [E]verybody['s] been there, that's not where we wanted to go. We wanted to say how about good rational thinking supported by strong findings that make a reasonable balance between the needs to protect ag[riculture], forest and the natural landscapes and the need to create livable communities."

Richard Whitman, the director of DLCD when the division 27 rules were promulgated, also spoke at the

January 2008 hearing. Consistently with Worrix's explanation, Whitman explained that the best achieves standard is not an *"optimization standard"* such that "there's only one best" regional designation. (Emphasis added.) Whitman explained that "best" is used in the context of a "balance" in the designation of urban and rural reserves that "in its entirety looking at the region as a whole * * * best achieves three different things"—that is, "livable communities, viability and vitality of agricultural and forest industries and protection of important natural landscape features." As Whitman explained, "[t]hose three things are in some tension obviously and so the balancing in between those is going to require a fair amount of judgment[]"—that is, "there is substantial discretion initially for Metro and [the] counties to make their decisions." Thus, according to Whitman, "because of the context" in which "best" is used, the standard allows for "a range of possible outcomes that Metro and the counties can come to."

Thus, LCDC's interpretation of the best achieves standard to permit a range of permissible designations by Metro and the counties is plausible and is not inconsistent with the division 27 rules, their context, or other sources of law. Accordingly, we defer to it.

4. *Satisfaction of Standard Is Demonstrated through Findings Concerning Application of the Reserve Factors*

Finally, LCDC concluded that "best achieves" is "a standard that Metro and the counties must demonstrate has been met, through their findings." Specifically, LCDC reasoned:

"[T]here is a relationship between the 'factors' that Metro and the counties must consider for urban reserves under OAR 660-027-0050 and rural reserves under OAR 660-027-0060, and the overall objective in OAR 660-027-0005(2). Metro and the counties must explain how the overall objective is met through their findings applying the urban and rural reserve factors to determine which areas to designate as urban and rural reserves."

Reduced to its fundamental core, LCDC's reasoning appears to be predicated on its understanding that "best achieves" is a standard that ultimately allows for a range of permissible joint designations. As we understand LCDC's reasoning, Metro and the counties' discretion is not unbridled but, consistently with the statutory and regulatory scheme, is guided by their consideration of the urban and rural reserve factors and the need for "a balance in the designation of urban and rural reserves that, in its entirety, best achieves livable communities, the viability and vitality of the agricultural and forest industries and protection of the important natural landscape features that define the region for its residents." OAR 660-027-0005(2). Thus, LCDC's interpretation of the best achieves standard to require Metro and the counties to demonstrate that the standard has been satisfied—that is, that the joint designation in its entirety falls within the range of permissible designations—through their findings concerning the application of the reserve factors is plausible and not inconsistent the statutory or regulatory schemes. Further, that interpretation is consistent with the plain text of OAR 660-027-0040(10), which requires that Metro and the counties' findings concerning the application of the reserve factors must explain not only "why areas were chosen as urban or rural reserves" but also "how these designations achieve the objective stated in OAR 660-027-0005(2)." Accordingly, because LCDC's interpretation of its rules is plausible and not inconsistent with their text or context or with the governing statutes, we, once again, defer to it.

In sum, we conclude that the four legal premises informing LCDC's review of the best achieves standard are individually and collectively valid—as were the five premises informing LCDC's review of the consideration and application of the reserve factors. Thus, to the extent that petitioners' contentions hinge on the abstract invalidity of those legal premises, we reject them.

Nevertheless, several petitioners raise other challenges to LCDC's review of particular aspects of Metro and the counties' designation. We turn now to those particular (often site-specific) "as-applied" challenges.

## VII.   PETITIONERS' PARTICULARIZED
CHALLENGES

A. *LCDC Properly Understood That Designation Was Not a "Political" Decision*

Before addressing the parties' particularized contentions on a county-by-county-basis, we begin by rejecting an overarching contention—pertaining to LCDC's application of the principles circumscribing its review—that was raised by several petitioners. Specifically, they contend that LCDC erroneously understood the designation of urban and rural reserves to be a "political" decision materially unconstrained by legal requirements—and, as a result, impermissibly deferred to Metro and the counties in its review of the urban and rural reserves submittal. That contention finds ostensible support in the following statement from a 2010 DLCD report that LCDC quoted in its order: With the exception of the "best achieves" and "amount of land" standards, "'[DLCD] believes that the statutes and rules that guide this effort replaced the familiar standards-based planning process with one based fundamentally on *political checks and balances*[.]'" (Emphasis added.)

That emphasized language notwithstanding, it is evident from the totality of the context of LCDC's review, including its construction of the governing statutes, ORS 195.137 - 195.145, and its own implementing rules, OAR 660-027-0005 - 660-027-0080, that LCDC fully and correctly understood that the designation of urban and rural reserves is not a "political" decision, materially unconstrained by legal requirements. As we have already explained in detail, 261 Or App at 293-318, LCDC identified nine legal principles circumscribing its review of the designation of urban and rural reserves. Although (as we will now proceed to explain) particular aspects of LCDC's review and analysis—including its application of those legal principles—are susceptible to reasoned challenge, petitioners' "political" deference complaint is unavailing. Accordingly, we proceed to petitioners' more focused challenges.

B.  *Washington County*

1.  *Misapplication of Rural Reserve Factors*

Because our resolution of petitioner Friends' second assignment of error obviates the need to consider petitioners' remaining contentions pertaining to Washington County's designation of reserves, we begin there. In that assignment, Friends contends that LCDC erred in approving Washington County's misapplication of the rural reserve factors. As explained below, we agree with Friends.

In setting the stage for our consideration of Friends' specific contentions, we describe the process by which Washington County applied the rural reserve factors. The county first conducted a suitability assessment in which it applied the urban reserve factors, ORS 195.145(5); OAR 660-027-0050, and the rural reserve factors, ORS 195.141(3); OAR 660-027-0060, to "all areas potentially suitable for designation as either Urban or Rural Reserves." That area consisted of approximately 171,000 acres in Washington County within a five-mile band adjacent to the existing UGB.

To assess suitability, Washington County identified "land attributes" that "represent[ed] or define[d] the LCDC factors identifying Urban and Rural Reserves." Many of those attributes reflected principles embodied in the ODA Report (*e.g.*, ODA's identification of land as Foundation, Important, or Conflicted and soil classifications). The county then mapped those attributes using a geographic information system (GIS) application. Washington County further explained that the

"attributes [were] ranked based on their relative ability to support the intended use. A numeric value representing this ranking was then applied. Once all of the layers were selected and assigned they were weighed based on their relative importance and then added together to generate a suitability layer that was mapped."

Ultimately, land was assigned a numeric value from 1.7 (least suitable) to 8.4 (most suitable) indicating its suitability for designation as rural reserves. In the end, the suitability assessment indicated that *all* the studied lands "remain[ed] candidates for potential Rural Reserves."

For that reason, Washington County "began more detailed evaluations" to identify candidate rural reserve areas for the protection of the agricultural industry. Noting that the ODA Report was the basis for its evaluation of such land, Washington County explained that most of the land that it sought to study was identified as either Foundation Agricultural Land or Important Agricultural Land. Further, Washington County explained that, because "the majority of the existing UGB [in Washington County] abuts Foundation Agricultural Land," there "will be serious consideration of adoption of Urban Reserves on the valley floor near existing cities." For those reasons, the county concluded that it was "necessary" to evaluate "additional characteristics (beyond the [ODA Report]) for each [f]actor."

In general terms, Washington County divided the "entire reserve study area * * * into 41 sub-areas" and, in applying the factors, assessed four attributes: (1) "[t]he degree to which the sub-area was subject to urbanization"; (2) "[t]he productivity rating of the area"; (3) "[t]he degree to which the area has multiple parcels"; and (4) "[t]he physical features of each area."[34] Ultimately, based on that assessment, the county assigned all sub-areas "into one of four tiers based on their suitability as rural reserve."

In sum, contrary to the county's apparent assertions on review, we do not understand that its initial suitability assessment—which incorporated principles from the ODA Report—played any role in its eventual identification of candidate rural reserve areas—which was fundamentally predicated on the assessment of the four attributes described above. As a practical matter, the county used those four, narrowly focused attributes as inexact surrogates for the statutorily prescribed rural reserve factors. Thus, the attributes functioned as "pseudo" factors.

The county's use of those attributes (or pseudo factors) is at the heart of Friends' contentions on review. Accordingly, we describe in detail Washington County's employment of those attributes in relation to its application of two of the statutorily prescribed rural reserve factors.

---

[34] The county also assessed "[r]esidential dwelling density * * * in those sub-areas that had clustered housing."

As to the statutory factor pertaining to whether land has "suitable soils and available water where needed," ORS 195.141(3)(c),[35] the county identified four potential rating systems. The first two systems—"[s]oil-capability classifications" and "[h]igh-value farmland"—were based on the National Resource Conservation Service (NRCS) classifications of "agricultural capability" and "importance." The third rating system—the ODA Report—was also based on the NRCS classifications. However, the fourth system— "[a]gricultural productivity ratings for soils"—was based on a report authored by J. Herbert Huddleston entitled *Agricultural Productivity Ratings for Soils of the Willamette Valley*, Oregon State University Extension Service - Circular 1105 (1982) (the Huddleston Report). As the county explained,

> "[t]his rating system was developed by J. Herbert Huddleston, an OSU Extension Service Soil Specialist. This system divides soils into three categories: Native Productivity, Maximum Productivity for Dryland farming, and Irrigated farming. This rating system is based on actual yields for indicator crops and provides a ratings-based system for dryland and irrigated maximum crop productivity. One of the intended uses of the report is to help planners make difficult decisions when choosing among competing uses for agricultural land. It also highlights the importance of water * * *."

(Footnotes and internal quotation marks omitted.)

Even though the statutory factor pertaining to soil suitability and water availability was derived from the ODA Report and its concomitant reliance on the NRCS classifications, the county discounted the first three rating systems (which were all predicated on NRCS classifications), primarily because—in the county's view—they were not useful tools for determining which Foundation Agricultural Land in the county was most suitable for designation as rural reserves. Instead, the county determined that the rating

---

[35] As we have previously explained, 261 Or App at 279, LCDC, in promulgating OAR 660-027-0060(2), simply incorporated the rural reserve factors from ORS 195.141(3) that pertained to protection of the agricultural industry. For convenience, in analyzing Washington County's application of the rural reserve factors, we refer to the statutory factors.

system described in the Huddleston Report was the most useful because "future water availability will be a significant limiting factor" and that this ranking system "highlights the importance of irrigation" and allows for a more refined analysis. Thus, as a practical matter, the county's analysis of "suitable soils and available water where needed," ORS 195.141(3)(c), essentially reduced to a single attribute (or pseudo factor)—that is, whether land is irrigated (*i.e.*, whether land is in an irrigation district or has an existing agricultural water right based on "place of use"). As the county explained,

> "[a]ll parcels throughout the study area were assessed for agricultural productivity based on the availability of water. This method of determining productivity is based on Huddleston's 1982 soil productivity study * * *. As shown in this report, irrigation increases the productivity rating of most soils, including significant increases in the productivity rating of moderately rated soils. Soils that were in the [Tualatin Valley Irrigation District (TVID)] or had an existing water right were given the Irrigated productivity rating. Remaining soils were given the Dryland productivity rating. GIS data layers were then mapped to reveal those areas where maximum productivity was attainable. Sub-areas were rated higher for productivity if a majority of the parcels were at or above 90 on the productivity rating scale. Parcels were rated lowest for agricultural productivity if they had no access to water for agriculture."

The county then turned to the statutory factor concerning whether land is "suitable to sustain long-term agricultural operations" taking into account, among other things, "[t]he existence of a large block of agricultural or other resource land with a concentration or cluster of farms" and "[t]he agricultural land use pattern, including parcelization, tenure and ownership patterns." ORS 195.141(3)(d). As to that statutory factor, the county explained:

> "Data is currently not available for several attributes that could assist farmland analysis, such as information on leased or rented farmland that could be used to determine types and sizes of farm operations. The only information that can be easily analyzed is ownership and parcel sizes. * * *

"* * * * *

"Parcelization of a sub-area was used in the analysis given Staff's belief that commercial agricultural production is more easily facilitated in areas where parcel size is large enough to viably farm, given economies of scale, and the input cost of agricultural infrastructure such as drainage tile, machinery, etc. Additionally, the degree of parcelization tends to correlate with residential dwelling density. Conflicts *** between agricultural and non-agricultural users can increase as a result. Areas of high parcelization were therefore rated comparatively low for rural reserve designation. *** Staff considered a sub-area to be parcelized if a majority of the tax lots in the areas were generally 35 acres or less."

In sum, although the statutory "suitability" factor contemplates the assessment of a variety of attributes, the county's analysis essentially reduced to a single attribute (or pseudo factor)—that is, the degree to which an area was parcelized.

Before LCDC, Friends objected to the reserves designation, asserting that Washington County's analysis of the rural reserve factors was "legally flawed" and resulted in their misapplication. Specifically, Friends asserted:

"The County analysis brought in elements not in the law, and used various weighting schemes to measure these and other elements, resulting in an analytical system that in some cases is actually contrary to both the purpose and factors of the Reserve statute and rule.

"Metro appears to have incorporated most or all of this analysis in its decision, resulting in a flawed final reserves decision for the Washington County portion of the regional reserves decision."

(Footnote omitted.)

Friends notes that "the legislative and administrative records demonstrate" that the rural reserve factors in ORS 195.141(3) and OAR 660-027-0060(2) "are derived from the [ODA Report]" and reflect the "substantive policy" reflected therein. For that reason, Friends explained that, in analyzing the factors, Metro and the county cannot "undermine" the policy reflected in the ODA Report.

Stated simply, Friends contended that, because the statutorily prescribed rural reserve factors derive their

meaning from the ODA Report—which was based on particular assumptions and the use of particular methodologies—the principles embodied in that report circumscribe the application of the factors and, to the extent that Washington County departed from those principles, its application of the factors was legally erroneous. According to Friends, Washington County did just that in assessing whether land "[h]as suitable soils and available water," ORS 195.141(3)(c), and whether the land "[i]s suitable to sustain long-term agricultural operations" by taking into account "[t]he existence of a large block" of agricultural land, ORS 195.141(3)(d)(A).

LCDC rejected Friends' contentions. Specifically, LCDC reasoned:

> "Contrary to ODA's and 1000 Friends' arguments,[36] the Commission finds that the reserves decisions findings do not consider elements not contemplated by the statute or rule. While the interpretations and application of the rule are not those ODA and 1000 Friends would prefer, the findings establish that Metro and Washington County considered each of the factors and reached conclusions based on substantial evidence in the record, with an adequate factual base."

On review, Friends contends that LCDC erred in approving "Metro's use" of Washington County's "alternate agricultural analysis to evaluate land for rural reserves designation," which was "simply a misapplication of the factors * * * under another name." Friends, essentially reiterating its contentions before LCDC, challenges, in particular, the county's application of the two rural reserve factors that were foreshadowed above.

Friends first points to ORS 195.141(3)(c), the "suitable soils and available water" factor. With regard to the county's analysis of soil suitability, Friends contends that the county used an "alternative ranking system for this factor." Specifically, Friends emphasizes that the county assessed land using the agricultural productivity methodology reflected in the Huddleston Report—rather than the

---

[36] We note that, in 2011, Friends submitted exceptions to LCDC in which it "incorporate[d] and renew[ed] all arguments" made by, among others, ODA.

methodology underlying the ODA Report, which was predicated on NRCS classifications concerning "agricultural capability" and "importance." As to the county's analysis of water availability, Friends asserts that the county—contrary to the assumptions and methodology underlying the ODA Report—erroneously equated "available water where needed" in ORS 195.141(3)(c) with a qualitatively distinct attribute—*viz.*, whether land is irrigated—and, as a result, the county's analysis of land failed to consider whether water was "needed" as required by both statute and administrative rule. As we understand it, Friends' fundamental challenge is that "available water where needed," ORS 195.141(3)(c), and whether land is irrigated are not congruent concepts because, as noted in the ODA Report, there are capable agricultural lands with available water that do not need irrigation to produce an agricultural product.

Friends also points to ORS 195.141(3)(d), which concerns whether land is "suitable to sustain long-term agricultural operations" by taking into account various considerations, including "[t]he existence of a large block of agricultural or other resource land with a concentration or cluster of farms," ORS 195.141(3)(d)(A). Specifically, Friends contends that, contrary to the substantive policy embodied in the ODA Report, the county "equates 'large block' with large 'parcel,' and 'parcelization' with 'ownership'" and "considered an area 'parcelized,' and therefore too small for farming, if the 'majority of *tax lots* * * * were generally 35 acres or less,' regardless of whether the 'parcels' were in agricultural use, or part of a larger farming area."[37] (Emphasis and omission in Friends' brief.)

Washington County remonstrates that, because much of the land in the county is Foundation Agricultural Land, it was "justified" in further refining its analysis "to explore other qualities not noted in the [ODA Report]." Moreover, the county emphasizes that its "analysis did not replace the factors; it enhanced the level of detail so that

---

[37] Friends also contends that there were legal flaws in the county's analysis of the other two rural reserve factors—*viz.*, "potentially subject to urbanization," ORS 195.141(3)(a), and whether land "[i]s capable of sustaining long-term agricultural operations," ORS 195.141(3)(b). We reject those contentions without discussion.

[it] could make more refined determinations as it applied the factors. Thus, the analysis was more rigorous, and not irrelevant, inaccurate, or contrary to the factors as Friends states." As amplified below, we disagree with Washington County and conclude that LCDC erred in approving a designation that was predicated on the county's legally flawed application of ORS 195.141(3)(c) and ORS 195.141(3)(d).

At the outset, we reemphasize two points. *First*, the rural reserve factors in ORS 195.141(3) were derived from the ODA Report. 261 Or App at 270-71, 270 n 5. *Second*, in promulgating OAR 660-027-0060(2), LCDC simply incorporated the rural reserve factors from ORS 195.141(3) that pertained to protection of the agricultural industry. 261 Or App at 279. Thus, resolution of the parties' competing contentions depends on the proper construction of the statutory factors in ORS 195.141(3). Accordingly, we apply the familiar methodology in *PGE*, 317 Or 606, as amplified in *Gaines*, 346 Or 160, which requires an examination of "the text and context of the statute and any legislative history that appears to be helpful * * *." *Bell*, 353 Or at 540.

We begin with the text of the statutorily prescribed rural reserve factors. Again, ORS 195.141(3) provides:

"When designating a rural reserve under this section to provide long-term protection to the agricultural industry, a county and [Metro] shall base the designation on consideration of factors including, but not limited to, whether land proposed for designation as a rural reserve:

"(a) Is situated in an area that is otherwise potentially subject to urbanization during the [urban reserves planning period], as indicated by proximity to the [UGB] and to properties with fair market values that significantly exceed agricultural values;

"(b) Is capable of sustaining long-term agricultural operations;

"(c) Has suitable soils and available water where needed to sustain long-term agricultural operations; and

"(d) Is suitable to sustain long-term agricultural operations, taking into account:

"(A)  The existence of a large block of agricultural or other resource land with a concentration or cluster of farms;

"(B)  The adjacent land use pattern, including its location in relation to adjacent nonfarm uses and the existence of buffers between agricultural operations and nonfarm uses;

"(C)  The agricultural land use pattern, including parcelization, tenure and ownership patterns; and

"(D)  The sufficiency of agricultural infrastructure in the area."

Although we generally turn to dictionary definitions to determine the ordinary meaning of undefined statutory terms such "capable" and "suitable," doing so here would be of limited usefulness.[38] That is so because the factors were derived from the ODA Report. Accordingly, we turn to the ODA Report itself to determine the essential content of those statutory factors.

As previously explained, 261 Or App at 268, the ODA Report described an analysis of agricultural lands based primarily on "an examination of both the *capability* (ability of the land to produce an agricultural product) and the *suitability* (ability to conduct viable farm use) of any given tract of land to be utilized for farm use." (Emphasis added.) Thus, in the context of the ODA Report, "capability" and "suitability" are qualitatively distinct concepts whose content derives from ODA's use of particular methodologies and assumptions in examining agricultural lands.

"Capability" refers to the "[t]he *physical ability* of land to produce an agricultural product." (Emphasis added.) According to ODA, the "capability" of land "is a key and dominant factor in any assessment." Further, ODA explained

---

[38] *Webster's* at 330 (defining "capable" to mean, among other things, "having * * * attributes to perform or accomplish—usu. used postpositively with *of* followed by a gerund or actional noun" (emphasis in original)); *id.* at 2286 (defining "suitable" to mean, among other things, "having the necessary qualifications"); *see also Merriam-Webster Unabridged Dictionary* (noting that a synonym for "capable" is "suitable"), http://unabridged.merriam-webster.com/unabridged/capable (accessed on Feb 14, 2014); *id.* (noting that a synonym for "suitable" is "capable"), http://unabridged.merriam-webster.com/unabridged/suitable (accessed on Feb 14, 2014).

that, in assessing "capability," the "[q]uantity and quality of soils and water play a significant role."

Turning first to the quantity and quality of soils, ODA relied on NRCS classifications concerning "agricultural capability" and "importance." In terms of "agricultural capability," NRCS places soils into eight agricultural capability classes. As ODA noted, "[t]he better the agricultural capability (decreasing from I-VIII), the less management (input) is required by the operator to produce a crop." In terms of "importance," NRCS classifies farmland as "prime" (*i.e.*, "land that has the best combination of physical and chemical characteristics for producing food, feed, forage, fiber and oilseed crops") or "unique" (*i.e.*, "land other than prime farmland used for the production of specific high value food and fiber crops"). In turn, NRCS's agricultural capability and importance classifications are used to define "high-value farmland." ORS 215.710; OAR 660-033-0020(8). As ODA summarized, "high-value farmland" is "land in a tract composed predominantly (50.1%) of certain specified soils," including those classified by NRCS as "Prime, Unique, Capability Class 1, or Capability Class 2 <u>not irrigated</u>" or "Prime Unique, Capability Class 1, or Capability Class 2 <u>if irrigated</u>[.]" (Underscoring in original.)

In addition to capable soils, ODA noted that the availability of water is "key to the production of many high-value crops." Nonetheless, although acknowledging the importance of available "water for irrigation of agricultural crops and livestock watering," ODA explained that "many crops, including high-value crops, can be produced using dryland agricultural practices," which are "most feasible where precipitation is adequate to allow economic return on a nonirrigated crop." In other words, ODA's assessment of water availability was predicated on its understanding that the need for water is a function of the type of agricultural activity occurring on the land, and, for that reason, capable agricultural lands do not necessarily require irrigation.

By contrast, "suitability" does not concern the physical capability of land (*e.g.*, whether the land has suitable soils and available water). Instead, "suitability" refers to the ability of a tract of land to be utilized for long-term farm use

based on other factors (*e.g.*, adjacent and area land use patterns; agricultural land use patterns; parcelization, tenure, and ownership patterns; agricultural infrastructure; zoning; location in relationship to adjacent lands zoned for non-resource development; location and availability of edges and buffers to insulate and protect agriculture operations from nonfarm uses). In particular, with regard to "parcelization," ODA explained that,

> "[i]n analyzing suitability, parcelization is important, but not always as a stand-alone factor. All other factors being equal, smaller parcels under multiple ownerships are less favorable for long-term commercial farm use. The practice of renting or leasing smaller (and larger) parcels is very common in the region and needs to be taken into account. Long term, if the smaller parcels are protected for farm use, they frequently become available for rent, lease or acquisition for farm use, especially if they do not contain dwellings."

Ultimately, ODA explained:

> "Most of the suitability factors can be related to the position of farming operations as part of a large block of agricultural land or other resource lands. Protecting and maintaining large blocks of agricultural land is key to maintaining the integrity of working lands. Integrity involves many issues including the ability to operate with limited conflicts, curtail speculative land values and maintain a critical mass of land sufficient to leverage the infrastructure needs of the industry."

In sum, the principles articulated in the ODA Report circumscribe the essential content of three of the four statutory factors. In particular, the concept of "capability"—the physical ability of the land to produce an agricultural product—is reflected in two of the statutory factors—*viz.*, ORS 195.141(3)(b) (whether land "[i]s capable of sustaining long-term agricultural operations") and ORS 195.141(3)(c) (whether land "[h]as suitable[39] soils and available water where needed to sustain long-term agricultural operations"). By contrast, the qualitatively distinct concept of "suitability"—the ability of a tract of land to be utilized for long-term

---

[39] We appreciate that the statute uses the term "suitable." Nevertheless, as explained in the ODA report, suitable soils and available water are key components in assessing the "capability" of land.

farm use based on a variety of considerations unrelated to its physical ability—is reflected in ORS 195.141(3)(d) (whether land "[i]s suitable to sustain long-term agricultural operations, taking into account," *inter alia*, "[t]he existence of a large block of agricultural or other resource land" and "[t]he agricultural land use pattern, including parcelization, tenure and ownership patterns").

With that understanding of the ODA Report and its relationship to the statutory factors, we turn to Friends' specific challenges concerning the county's application of two of the rural reserve factors—that is, ORS 195.141(3)(c) and ORS 195.141(3)(d). As explained below, we agree with Friends that the county misapplied those factors.

Friends first contends that the county's analysis of "suitable soils and available water where needed," ORS 195.141(3)(c), was contrary to meaning of that factor as reflected in the methodology underlying the ODA Report. We agree. The ODA Report demonstrates that an examination of "suitable soils and available water where needed to sustain long-term agricultural operations," ORS 195.141(3)(c), refers to an evaluation of the quantity and quality of soils by reference to NRCS classifications concerning "agricultural capability" and "importance" and the availability of water needed for the type of agricultural activity occurring on the land. However, the county essentially rejected the ODA Report as well as its predicate underpinnings (*i.e.*, the NRCS classifications and the recognition that capable agricultural lands do not necessarily require irrigation). Instead, the county used a productivity ranking system identified in the Huddleston Report, which, in turn, equated the assessment of "suitable soils and available water where needed" with a single attribute—that is, whether land is irrigated. The county's singular focus on irrigation effectively read the words "where needed" out of the statute and was contrary to the principles reflected in the ODA Report—and, in turn, the meaning of ORS 195.141(3)(c). Thus, the county misapplied that factor.

Friends also contends that, in determining whether land "[i]s suitable to sustain long-term agricultural operations," ORS 195.141(3)(d), the county impermissibly assessed

the existence of "large block[s]" of agricultural land, ORS 195.141(3)(d)(A), by analyzing a single attribute—*viz.*, the degree to which an area was parcelized. Again, we agree with Friends. Simply stated, pursuant to ORS 195.141(3)(d), the legislature clearly intended that an examination of "parcelization" for purposes of ORS 195.141(3)(d)(C) was distinct from an examination of "[t]he existence of a large block of agricultural land" for purposes of ORS 195.141(3)(d)(A). Moreover, as the ODA Report demonstrates, those two concepts are qualitatively different. The concept of "large blocks" refers to the functional relationship of agricultural land to other agricultural or resource lands and the identification of large, intact agricultural areas. By contrast, evaluating "parcelization"—that is, the number and size of parcels within an area—does not concern the functional relationship of a parcel to other lands. Thus, the county misapplied ORS 195.141(3)(d).

The county's attempt to "justif[y]" its application of those factors on the ground that it was necessary "to explore other qualities not noted in the [ODA Report]" because much of the land in the county is Foundation Agricultural Land is unavailing. Because the meaning of the statutory factors derives from the ODA Report, the county may permissibly evaluate quantitative attributes that are consistent with the assumptions, principles, and methodologies described in that report. *See Parklane*, 165 Or App at 24 (affirming LUBA's rejection of Metro's reliance on URSA-matic data— that is, data generated from a computer application that examined various attributes—to measure the suitability of land for designation as urban reserve under the division 21 rules "at least in the absence of a showing that the data was responsive to the considerations required by [the applicable] rule"). However, as we have explained, that is not what the county did here. Instead, the county predicated its assessment on narrowly circumscribed pseudo factors that did not meaningfully engage with the content of the statutorily prescribed factors as derived from the ODA Report.

Accordingly, we conclude that, because Washington County's analysis of the rural reserve factors was legally impermissible, it necessarily misapplied the rural reserve

factors and LCDC erred in concluding otherwise. Thus, LCDC's order is unlawful in substance in that regard and must be reversed and remanded. ORS 197.651(10)(a) (providing that we shall reverse or remand an order if, among other things, it is "[u]nlawful in substance").

2. *Effect of Washington County's Misapplication of the Rural Reserve Factors*

Washington County's erroneous application of the rural reserve factors is significant and, as we will explain, obviates the need to consider many of petitioners' remaining contentions. We begin by noting that, because the designation of urban and rural reserves are interrelated—particularly where Foundation Agricultural Land is involved[40]—on remand, LCDC must, in turn, remand Washington County's reserves designation as a whole for reconsideration. Further, it follows that, because the best achieves standard applies to Metro and the counties' joint designation "in its entirety," LCDC must remand the entire submittal to Metro and the counties so that they can ultimately assess whether any new joint designation, in its entirety, satisfies that standard.

Thus, our disposition of Friends' second assignment of error—which requires a remand of Washington County's designation of urban and rural reserves and a remand to Metro and the counties to assess whether any new joint designation satisfies the best achieves standard—obviates the need to further consider petitioners Friends', Save Helvetia's, and Chesarek's remaining contentions pertaining to Metro and the county's application and consideration of the factors as they pertain to the designation of reserves in Washington County. Further, our disposition obviates the needs to consider any of petitioners' remaining contentions pertaining to whether the joint submittal satisfied the best achieves standard. Accordingly, we turn to the contentions pertaining to Clackamas County's and Multnomah County's application and consideration of the factors in designating urban and rural reserves in those counties.

---

[40] *See* OAR 660-027-0040(11) ("[I]f Metro designates [Foundation Agricultural Land] as urban reserves, the findings and statement of reasons shall explain, by reference to the factors in OAR 660-027-0050 and 660-027-0060(2), why Metro chose the Foundation Agricultural Land for designation as urban reserves rather than other land considered under this division.").

## C. *Clackamas County*

### 1. *Application of OAR 660-027-0060(4), aka the "Safe Harbor Provision," to Area 4J and Clackamas County's Revised Rural Reserve Findings on Remand*

In his second assignment of error, Maletis contends that LCDC erred in approving Clackamas County's application of OAR 660-027-0060(4)—that is, the "safe harbor provision"—in designating Maletis's property rural reserves. As previously noted, 261 Or App at 281, that rule provides:

> "Notwithstanding requirements for applying factors in OAR 660-027-0040(9) and [OAR 660-027-0060(2)], a county may deem that Foundation Agricultural Lands or Important Agricultural Lands[41] within three miles of a UGB qualify for designation as rural reserves under [OAR 660-027-0060(2)] without further explanation under OAR 660-027-0040(10)."

In particular, Maletis asserts that the safe harbor provision contravenes the requirement in ORS 195.141(3) that, "[w]hen designating a rural reserve under this section to provide long-term protection to the agricultural industry," Metro and a county "shall base the designation on consideration" of a nonexclusive list of factors. That is so, according to Maletis, because "the 'safe harbor' provision * * * effectively carves out an administratively-created exception to the mandatory requirement" that Metro and a county must "consider the delineated reserves factors under ORS 195.141(3)."

However, under the circumstances of this case, we need not resolve Maletis's contention that application of the safe harbor provision excuses Metro and the counties from considering the reserve factors. To explain why that is so, a brief explanation of the procedural history underlying Clackamas County's designation of rural reserves is necessary.

In the initial designation of reserves that was submitted to LCDC for review, Clackamas County essentially

---

[41] As previously explained, Foundation Agricultural Lands and Important Agricultural Lands are those lands mapped as such in the ODA Report. 261 Or App at 281 n 14.

relied on the safe harbor provision in designating Area 4J—which includes Maletis's property—as rural reserves. However, after LCDC remanded Washington County's designation, Clackamas County—without amending its underlying ordinance—revised its findings concerning the designation of reserves in the county. In those revised findings Clackamas County again relied on the safe harbor provision in designating Area 4J as rural reserves but, in doing so, also explained why that land should be so designated based on the county's own consideration of the rural reserve factors.

On review, consistently with his objection before LCDC, Maletis, in his fifth assignment of error, contends that Clackamas County erred in adopting the revised findings in support of the reserves decision without amending its original ordinance.[42] LCDC denied the objection, reasoning, in part, that the county's revised findings "are consistent with the previous findings and do not alter or otherwise affect the previously adopted ordinance." LCDC further reasoned that, because Clackamas County "did not amend its ordinance in connection with the re-designation submittal (as Metro and Washington County did)[,]" the county "was not bound to follow 'an amendment process that is substantially similar to that used to adopt the ordinance'" as Maletis had asserted.

We sustain LCDC's rejection of Maletis's objection. Even if we assume for the sake of argument that Maletis is correct that Clackamas County's process in adopting the revised findings was deficient, Maletis did not contend, much less explain and establish, before LCDC that, in the circumstances of this case, he suffered cognizable prejudice as a result of those deficiencies. *See* ORS 197.633(3)(b) (LCDC's standard of review "[f]or procedural issues[] is whether the local government failed to follow the procedures applicable to the matter before the local government in a manner that prejudiced the substantial rights of a party to the proceeding"). For example, as Clackamas County noted, Maletis failed to "explain why the county's failure to hold

---

[42] Although Graser-Lindsey raises a substantively similar contention, it was unpreserved. Accordingly, we do not consider it.

public hearings and two readings affected [his] ability to argue against French Prairie's rural designation"—the area in which Maletis's property is located—and "[did] not state what [he] would have done at a hearing or between the two readings to affect the [county's] decision which had already been approved by LCDC." Thus, LCDC did not err in denying Maletis's objection to the validity of Clackamas County's revised findings.

In sum, we reject Maletis's contention pertaining to Clackamas County's revised findings, and, having done so, we need not address Maletis's contentions pertaining to the county's application of the safe harbor provision to designate his property rural reserve. That is so because, even if LCDC erred in approving Clackamas County's application of the safe harbor provision to Maletis's property, the county's rural reserve designation is alternatively and independently based on its consideration of the factors as explained in the revised findings.

2. *Clackamas County's Application of the Rural Reserve Factors*

We conclude our review of Clackamas County-specific "application" matters by addressing Graser-Lindsey's contentions pertaining to the county's application of the rural reserve factors. Specifically, in her second assignment of error, Graser-Lindsey contends that LCDC erred in approving Clackamas County's misapplication of the rural reserve factors. As she had before LCDC, on review Graser-Lindsey contends that, in determining whether to designate land as rural reserves, the county had "rel[ied] primarily on the ODA [R]eport mapping categories"—that is, Foundation, Important, and Conflicted—and "neglected the mandatory consideration of the OAR 660-027-0060(2) factors," which resulted in the impermissible discounting of the agricultural value of Conflicted Agricultural Land.

As support for her contention, Graser-Lindsey refers to a matrix created by county staff in which the discussion of each rural reserve factor generally mirrored the information in the ODA Report. The matrix was a product of the analysis of "[e]xpert groups" identified by the county's Technical Advisory Committee. Each group analyzed the

suitability of the study areas in relation to particular rural reserve factors. An introduction to the matrix indicates that the underlying analysis "relie[d] heavily" on the ODA Report. Ultimately, the matrix was provided to the Policy Advisory Committee to assist in its discussions and recommendations pertaining to rural reserves.

Graser-Lindsey's contentions on review pertaining to the county's application of the rural reserve factors are unavailing for two interrelated reasons. First, Graser-Lindsey has not demonstrated that the county designated rural reserves based only on the mapping categories in the ODA Report. Without belaboring the point, the matrix to which she refers demonstrates that the county understood that the designation of rural reserves was based on the application of the factors themselves. Second, as we have explained, 261 Or App at 270-71, 270 n 5, the statutorily prescribed rural reserve factors derive their meaning from the ODA Report, and the principles embodied in that report circumscribe their application. Graser-Lindsey does not contend that the county's application of the factors was legally impermissible because it departed from the principles embodied in the ODA Report. Instead, the gravamen of her contention is that, in evaluating land for designation as rural reserves, the county relied too heavily on the information in the ODA Report—as opposed to other evidence in the record. That contention partakes of a substantial evidence challenge, which we address below. *See* 261 Or App at 363. Accordingly, as did LCDC, we conclude that Clackamas County did not misapply the rural reserve factors.

D. *Multnomah County*

1. *"Balancing" of the Factors*

In its first assignment of error, MLG contends that LCDC erred in failing to determine whether Metro and the counties (including Multnomah County) "balanced" the factors as part of their "consideration." Specifically, MLG contends that, in summarizing its review function, LCDC "fail[ed] to recite the 'balancing' requirement" and that LCDC failed to apply that requirement in addressing its objection concerning the designation of its property as rural reserve. MLG acknowledges that it did not raise that

contention before LCDC but asserts that it is reviewable as "plain error."[43] As we will explain, MLG's contention fails for two reasons.

First, as we reiterated in *1000 Friends of Oregon v. LCDC*, 244 Or App 239, 268, 259 P3d 1021 (2011) (*McMinnville*), "the focus of our review is on the issues presented on appeal that have been preserved before LCDC." MLG acknowledges that it did not preserve the contention that it seeks to raise on review.

Second, even assuming, without deciding, that plain error applies in this context and that the purported deficiency qualifies as such, we can review it and correct it only if we affirmatively exercise our discretion to correct the error after identifying our reasons for doing so. *Ailes v. Portland Meadows, Inc.*, 312 Or 376, 381-82, 823 P2d 956 (1991). Generally, it is incumbent on the party requesting such review to explain "why we should exercise our discretion to correct [the] error." *State v. Tilden*, 252 Or App 581, 589, 288 P3d 567 (2012). Here, MLG proffers no reasoned explanation—indeed, none at all—as to why we should exercise our discretion to remedy the purported plain error, and we are not obliged to search the record in an effort to hypothesize putative justifications *sua sponte*. Accordingly, we reject MLG's contention without further discussion.

2. *Adequacy of Multnomah County's Consideration of Rural Reserve Factors Pertaining to Area 9D*

As part of its first assignment of error, petitioner Barkers contends that LCDC erred in concluding that it was legally permissible to designate its property as rural reserve. Barkers owns approximately 62 acres in Multnomah County. The property is south of Skyline Boulevard and is bisected by Germantown Road at Kaiser Road. As we understand it, part of the property abuts the Metro UGB and the

---

[43] ORAP 5.45(1) ("No matter claimed as error will be considered on appeal unless the claim of error was preserved in the lower court and is assigned as error in the opening brief in accordance with this rule, provided that the appellate court may consider an error of law apparent on the record.); *State v. Brown*, 310 Or 347, 355, 800 P2d 259 (1990) (explaining that an error is plain if (1) "the error is one of law"; (2) "the legal point is obvious"—that is, "not reasonably in dispute"; and (3) to reach the error, "[w]e need not go outside the record or choose between competing inferences to find it" (internal quotation marks omitted)).

Washington County line and adjoins what is referred to in the record as the North Bethany area.

Barkers' property was studied for designation as rural reserve as part of Study Area 6 and for designation as urban reserve as part of Study Area 6b. Our understanding is that Study Area 6 is part of what was later denominated as Area 9D, which Multnomah County designated, in its entirety, as rural reserve.

Before LCDC, Barkers objected to the propriety of the designation of its property as rural reserve to protect important landscape features. LCDC denied that objection—as well as nine other objections pertaining to the propriety of the designation of particular properties—reasoning as follows:

"In each case, the objector asserts the county or Metro, or both made the wrong decision regarding designation (or non-designation) of a parcel or area. The allegations were that application of the factors in OAR chapter 660, division 27, supported a different conclusion, or that the final decision was not supported by the objector's understanding of the factors.

"As discussed above, the designation of urban and rural reserves is not intended to be a site-specific, parcel-by-parcel determination. Moreover, as was the case in many instances, in evaluating the factors, Metro and the counties could find that individual areas could be designated as either urban or rural reserve. The statutory process provides the jurisdictions the discretion as to whether or how to designate areas, provided they have fully evaluated the factors. Each of the counties and Metro has made findings with an adequate factual base, based upon substantial evidence in the record explaining how they considered the urban or rural factors with regard to the areas including these properties. Exhibit B to Ordinance No. 11-1255 [(the part of the redesignation submittal containing the reasons that Metro and the counties designated particular areas as urban or rural reserve)]. The issue is whether Metro and the counties considered the urban and rural reserve factors in deciding to designate particular areas, explained why the areas should be urban or rural reserves using the factors listed in the statute and rules, and whether there is evidence in the record as a whole that a reasonable person

could rely upon to decide as Metro and the counties did. With regard to each of these remaining individual parcels or areas, the Commission finds that *Metro and the counties appropriately considered the factors* and made adequate findings based on substantial evidence *for each of the areas subject to the objections listed above."*

(Emphasis added.) In other words, in denying Barkers' objection, LCDC concluded that, in designating Area 9D as rural reserve, the county had adequately considered the pertinent factors.

On review, Barkers essentially challenges that conclusion.[44] In particular, Barkers notes that its *property* was improperly designated as rural reserves solely because it was part of an *area* (*i.e.,* Area 9D) that the county designated as rural reserves and that "there is no indication that

---

[44] We note that Barkers further challenges LCDC's authority to affirm a local government's decision where its findings are inadequate if the evidence "clearly supports" the decision. To the extent that LCDC invoked such purported authority, it was merely as an alternative basis on which to affirm the designation of Barkers' property as rural reserve.

In its order, LCDC reasoned:

"In a recent decision on the City of Bend's proposed urban growth boundary, the Commission decided that where local findings are inadequate, the Commission nonetheless may affirm the local decision if the local government identifies evidence in the record that 'clearly supports' its decision. This is analogous to the express statutory authority for the Land Use Board of Appeals to affirm local land use decisions in these circumstances (the Commission indicated that it was adopting the same approach)."

According to Barkers, LCDC relied on that authority in claiming that "the 'evidence in the record clearly supports' a finding that Area[s] 9A-D (nearly all of the land in unincorporated Multnomah County) should be a rural reserve."

As LCDC noted, the Land Use Board of Appeals has express statutory authority to affirm a local decision in the absence of adequate findings if the evidence "clearly supports" it. ORS 197.835(11)(b) ("Whenever the findings are defective because of failure to recite adequate facts or legal conclusions or failure to adequately identify the standards or their relation to the facts, but the parties identify relevant evidence in the record which clearly supports the decision or a part of the decision, the board shall affirm the decision or the part of the decision supported by the record and remand the remainder to the local government, with direction indicating appropriate remedial action."). Although LCDC purports to have the same authority as LUBA, LCDC has not pointed to any statute—and we are not aware of one—that grants LCDC equivalent authority. Moreover, LCDC has not otherwise explained the origin of such authority. Thus, we agree with Barkers that LCDC lacks authority to affirm a local decision if evidence in the record "clearly supports" it. Nevertheless, as explained above, LCDC relied on an independently distinct ground to support the designation—*viz.,* that the county had adequately considered the pertinent factors.

[its] property was ever evaluated under the rural reserve factors at all."

The county, however, disputes Barkers' characterization of the issue for three reasons. As we will explain, each of those reasons is unavailing.

First, we disagree with the county's assertion that Barkers' contention raises only "the narrow question of the validity of the study area within which the Barkers Five property is located—that is, whether this study area complied with the standards for identifying 'areas' for evaluation as urban and rural reserve." As did LCDC, we understand Barkers' contention to pertain to the *propriety of designation of its property* and not to the propriety of composition of the study area of which it was a part.

Second and relatedly, the county asserts that the propriety of designating *Barkers' property* as rural reserve "is irrelevant to this court's review of the lawfulness of LCDC's review of the various <u>areas</u> designated as reserves." (Emphasis and underscoring in original.) However, as we have already explained, the gravamen of Barkers' contention that its property was improperly designated rural reserve solely because of its inclusion within Area 9D is that the county inadequately considered the reserve factors with regard to the land that it actually designated as rural reserves—that is, all of the land in Area 9D. *See* 261 Or App at 304-05. Resolution of that challenge requires an examination of the legal sufficiency of the county's "consideration" of the factors as to the "land" that was ultimately designated under the standards described above at 261 Or App at 298-301 (describing "consideration").

Finally, the county contends that Barkers' contention should be understood as a substantial evidence challenge to the designation of its property as rural reserve. Again, we disagree. As we have just noted, Metro and the counties' "consideration" of the factors is reviewed for legal error.

Thus, we agree with Barkers that the issue on review is whether the county adequately considered the pertinent factors in designating all of the land in Area 9D as

rural reserves. Further, as amplified below, we agree with Barkers that LCDC erred in concluding that the county's consideration was adequate. Before turning to our evaluation of the county's "consideration" of the pertinent rural reserve factors, we revisit the legal principles that govern our review.

As we have described, the legislature required that the designation of reserves be based on "consideration" of the pertinent reserve factors. ORS 195.141(3); ORS 195.145(5). Further, as we have explained, 261 Or App at 301, "consideration" of the reserve factors requires that Metro and the counties (a) apply and evaluate each factor, (b) weigh and balance the factors as a whole, *and* (c) meaningfully explain why a designation as urban or rural reserves is appropriate. In other words, "consideration" of the reserve factors is a legal requirement that Metro and the counties must demonstrate in order for the designation of reserves to be sustained.

That demonstration must be made in Metro and the counties' joint and concurrent submittal to LCDC. OAR 660-027-0040(10) (providing, in part, that Metro and the counties "shall adopt a single, joint set of findings of fact, statements of reasons and conclusions explaining why areas were chosen as urban or rural reserves"). LCDC reviews the submittal for "[c]onsideration of the factors in OAR 660-027-0050 or 660-027-0060, whichever are applicable." OAR 660-027-0080(4)(c). In turn, we review LCDC's order to determine whether it is "unlawful in substance." ORS 197.651(10)(a).

Thus, in this case, the pertinent legal inquiry reduces to whether LCDC failed to correctly assess whether Multnomah County adequately "considered" the rural reserve factors in designating all of the land in Area 9D as rural reserves. As we have explained, legally sufficient "consideration" in this context, among other things,

> "requires that the local government meaningfully explain why a designation as urban or rural reserves is appropriate by reference to the totality of the land encompassed within that designation. In that regard, to the extent that a property owner challenges the inclusion of his or her property

within a designated area, the local government is obligated to have explained why its consideration of the factors yields, as to the totality of the designated land, a result that includes that property."

261 Or App at 305-06. Accordingly, as did LCDC, we assess the legal sufficiency of the county's explanation as to why all the land in Area 9D—including Barkers' property—was designated rural reserve by turning to the submittal itself.

In that regard, Metro and the counties' submittal explained why Area 9D was designated as rural reserves in conjunction with the explanation pertaining to another area (*i.e.*, Area 9F). In its entirety, the explanation pertaining to Areas 9D and 9F states:

"Rural Reserves 9A through 9F: West Multnomah County

"This map area includes the north portion of the regional study area. Subareas studied by the [Citizens Advisory Committee (CAC)] in the suitability assessment include NW Hills North ([Study] Area 5), West Hills South ([Study] Area 6), Powerline/Germantown Road-South ([Study] Area 7), Sauvie Island ([Study] Area 8), and Multnomah Channel ([Study] Area 9). MultCo Rec. 2986-3027.

"* * * * *

"Rural Reserves 9D and 9F: West Hills North and South, Multnomah Channel[45]

"*General Description:* This area extends from the Powerlines/Germantown Rd. area northward to the county line, with Sauvie Island and the west county line as the east/west boundaries. All of the area is proposed as rural reserve. Agricultural designations are Important Agricultural Land in 9D, and Foundation Agricultural Land in area 9F. All of area 9D is within three miles of the UGB, and the three mile line from Scappoose extends south to approximately Rocky Point Road in area 9F.

"*How Rural Reserve 9D and 9F Fare Under the Factors:* All of the Multnomah Channel area is an important landscape feature, and the interior area from approximately Rocky Point Rd. south to Skyline Blvd. is a large contiguous block

---

[45] Our understanding is that Study Area 5 (NW Hills North), Study Area 6 (West Hills South), and Study Area 9 (Multnomah Channel) were ultimately designated rural reserve and denominated Areas 9D and 9F.

on the landscape features map. MultCo Rec. 1767. This interior area is steeply sloped and heavily forested, and is known for high value wildlife habitat and as a wildlife corridor between the [C]oast [R]ange and Forest Park. It is also recognized as having high scenic value as viewed from both east Portland and Sauvie Island, and from the US Highway 26 corridor on the west. Landscape features mapping south of Skyline includes both Rock Creek and Abbey Creek headwaters areas that abut the [C]ity of Portland on the east and follow the county line on the west.

"The potential for urbanization north of the Cornelius Pass Rd. and Skyline intersection in area 9D, and all of area 9F, was ranked by the CAC as low. Limitations to development in the Tualatin Mountains include steep slope hazards, difficulty to provide urban transportation systems, and other key services of sewer and water. Areas along Multnomah Channel were generally ranked low due to physical constraints including the low lying land that is unprotected from flooding. Additional limitations are due to the narrow configuration of the land between US Highway 30 and the river coupled with extensive public ownership, and low efficiency for providing key urban services. MultCo Rec. 3022-3027. Subsequent information suggested some potential for urban development given the close proximity of US Highway 30 to the area.

"*Why This Area [W]as Designated Rural Reserve:* This area is proposed for rural reserve even though urbanization potential is low. Of greater importance is the high sense of place value of the area. The significant public response in favor of rural reserve affirms the CAC rankings on this factor. In addition, the high value wildlife habitat connections to Forest Park and along Multnomah Channel, the position of this part of the Tualatin Mountains as forming edges to the urban areas of both Scappoose and the Portland Metro region, further support the rural reserve designation."[46]

---

[46] Further, in explaining why the region designated Foundation Agricultural Land as urban reserve, Metro noted:

"Many areas of Important and Conflicted Agricultural Lands were not designated urban reserve in part because the presence of steep slopes, bluffs, floodplains, streams and habitat, limiting their suitability or appropriateness for urbanization:

"* * * * *

"• Rural Reserve 9D (West Hills South): steep slopes, many stream headwaters and courses. MultCo. Rec. 2993-30[0]3.

We conclude that, because the county failed to meaningfully explain why its consideration of the rural reserve factors yields a rural reserve designation of all land in Area 9D, LCDC erred in concluding that the county's "consideration" of the factors was legally sufficient. Two salient conjunctive observations suffice to explain why that is so.

First, in the submittal, Metro and the county both referred to the part of the county record in which the Citizen Advisory Committee and county staff applied each of the rural reserve factors to evaluate all of the land in Study Area 6—which included Barkers' property—and then ranked how the land in that study area fared under each of the factors. The application of the reserve factors to Study Area 6 often yielded different results as to the land in the area that is north of Skyline Boulevard and the land that is south of Skyline—including Barkers' property. Nevertheless, in the description in the submittal as to how Areas 9D (which encompasses all of Study Area 6) and 9F "fare under the factors," only a single sentence pertains to the land in Study Area 6 south of Skyline Boulevard: "Landscape features mapping south of Skyline includes both Rock Creek and Abbey Creek headwaters areas that abut the [C]ity of Portland on the east and follow the county line on the west." Nothing more.[47]

Second, the submittal's description of why Areas 9D and 9F were designated as rural reserve consists of a single paragraph with broad, unqualified declarations that appear to relate to some of the factors in OAR 660-027-0060(3) pertaining to the designation of rural reserves to protect

---

"Urban reserve factors (5), (7), and (8) seek to direct urban development away from important natural landscape features and other natural resources. Much of the Important and some Conflicted Agricultural Lands are separated from the UGB by, or include, important natural landscape features or rural reserves on Foundation or Important Agricultural Land:

"* * * * *

"• Rural Reserve 9D (West Hills South): steep slopes, many stream headwaters (Abbey Creek and Rock Creek) and courses. MultCo. Rec. 2993-30[0]3."

(Footnote omitted.)

[47] The remainder of the submittal's description refers to how the land in Area 9D (*viz.*, land in Study Area 6 north of Skyline as well as land in Study Area 9) and Area 9F (*viz.*, land in Study Area 5) fared under the factors.

important natural landscape features. However, it does not meaningfully explain why consideration of the pertinent factors yields a designation of all of the land in Area 9D—including Barkers' property—as rural reserve. That is so, because, as noted above, the application of the factors to Study Area 6 often yielded different results as to the land in the area that is south of Skyline Boulevard—including Barkers' property. For example, staff ranked the land in the study area south of Skyline Boulevard as having a high potential for urbanization and the land north of Skyline as having a low potential for urbanization.[48] Under those circumstances, a meaningful explanation as to why Area 9D, in its entirety, was designated as rural reserve would have acknowledged that application of the factors failed to yield similar results as to all of the land in the area but explained, nonetheless, why the entire area should be designated as rural reserve.

To be clear, as explained above, the county was not required to justify the designation of *Barkers' property*. Instead, the county was obligated to meaningfully explain why its consideration of the factors yielded a rural reserve designation of *all of the land* in Area 9D. Where, as here, a significant amount of land in an area—that is, in this case, the land in Area 9D south of Skyline Boulevard—is dissimilar from the rest of the land in that area as demonstrated by the county's application of the factors, the county must meaningfully explain why, notwithstanding the ostensible differences, it designated all of the land in that area as it did.

Such an explanation need not be elaborate but should acknowledge the dissimilarities and explain why, nonetheless, the county opted for the reserves designation that it did. For example, a county could acknowledge the qualities of dissimilar land within an area (*e.g.*, differences in potential for urbanization, slopes, or the importance of wildlife habitat compared to other land) but explain nonetheless that, despite those dissimilar qualities, the land should be designated along with the other land in the area (*e.g.*, on balance dissimilar land will serve as a buffer so as to reduce conflicts between urban and rural uses).

---

[48] The CAC ranked the land west of McNamee Road NW—including Barkers' property—as having a high potential for urbanization and land to the east of McNamee as having a low potential.

We thus conclude that LCDC erred in concluding that the county's "consideration" of the factors pertaining to the rural reserve designation of Area 9D was legally sufficient. Accordingly, we must remand LCDC's order in that regard. On remand, LCDC must determine the effect of that error on the designation of reserves in Multnomah County in its entirety.[49]

## VIII.   UNLAWFUL IN SUBSTANCE CONTENTIONS: LCDC'S SUBSTANTIAL EVIDENCE REVIEW

A.   *Standard of Review for Substantial Evidence*

Finally, we turn to petitioners' contentions that LCDC's order is unlawful in substance because LCDC erred in concluding that the designation of particular areas as either urban or rural reserves was supported by substantial evidence in the whole record. *See* ORS 197.633(3)(a) (providing that LCDC's standard of review "[f]or evidentiary issues[] is whether there is substantial evidence in the record as a whole to support the local government's decision").

A factual finding is supported by substantial evidence when the record, viewed as a whole, permits a reasonable person to make the finding. *Younger v. City of Portland*, 305 Or 346, 360, 752 P2d 262 (1988). Stated differently,

> "'the substantiality of supporting evidence [is evaluated] by considering *all* the evidence in the record.' *Younger*[, 305 Or at 356]. (Emphasis added.) That is, the court must evaluate evidence against the finding as well as evidence supporting it to determine whether substantial evidence exists to support that finding. If a finding is reasonable in light of countervailing as well as supporting evidence, the finding is supported by substantial evidence. *See Armstrong v. Asten-Hill Co.*, 90 Or App 200, 206, 752 P2d 312 (1988)."

*Garcia v. Boise Cascade Corp.*, 309 Or 292, 295, 787 P2d 884 (1990).

---

[49] In its first assignment of error, Barkers also contends that LCDC erred in approving the rural reserve designation of its property because the process was affected by "impermissible political or financial influence." We have considered and reject that contention without further discussion.

In its second assignment of error, Barkers raises an issue that it contends might arise on remand—that is, the county could apply the safe harbor provision, OAR 660-027-0060(4), to designate Barkers' property as rural reserve. We decline to address Barkers' contentions pertaining to that issue.

To the extent that the parties contend that the order on review is unlawful in substance because LCDC misapplied its standard of review for substantial evidence, our role is not to review Metro and the counties' submittal for evidentiary support. Instead, we determine whether LCDC understood and applied the substantial evidence standard correctly. *See Younger*, 305 Or at 358-59 (describing principle in analogous context of judicial review of a LUBA order); *McMinnville*, 244 Or App at 267-68 (applying principle in the context of judicial review of an LCDC order); *West Linn*, 201 Or App at 429 (same). In that regard, where LCDC properly articulates the substantial evidence standard of review, we will affirm unless the evidence is "so at odds" with LCDC's evaluation that we can infer that LCDC "misunderstood or misapplied" the proper standard. *Younger*, 305 Or at 359.

Although it would be "helpful and desirable," LCDC "need not always address in detail whether or not the conflicting evidence rendered the supporting evidence no longer substantial and why." *Id.* at 360 (internal quotation marks omitted). However, "where the evidence in the record is such that it would appear to [us] that [LCDC] has misunderstood or misapplied" substantial evidence review, LCDC "courts reversal if it does not explain its decision in more detail than a simple statement that it finds, upon consideration of all the evidence in the record, that the local government's decision is or is not supported by substantial evidence." *Id.* In other words, if conflicting evidence in the record gives rise to an inference that LCDC misunderstood its standard of review, LCDC "courts reversal" if it fails to provide a meaningful explanation as to why—even in light of the conflicting evidence—the local government's decision is supported by substantial evidence.

B. *LCDC's Understanding of Substantial Evidence Review*

In its order, LCDC articulated its standard of review under ORS 197.633(3), which requires, among other things, that, "[f]or evidentiary issues," LCDC reviews for "whether there is substantial evidence in the record as a whole to support the local government's decision." LCDC also explained its general understanding of what substantial evidence review entails:

"Any one area may be, and many areas could have been, designated either as an urban or a rural reserve. After considering both sets of factors under OAR 660-027-0050 and OAR 660-027-0060, many areas have characteristics such that Metro could have designated them as urban or a county designate them as rural reserve. The Commission reviews whether Metro considered the urban reserve factors in deciding to include particular areas, explained why the areas should be urban reserves using the factors listed in the statute and rules, and *whether there is evidence in the record as a whole that a reasonable person would rely upon to decide as Metro did.*

"In most instances, * * * the Commission does not review the decision to determine whether an area would be *better* as a rural reserve than as an urban reserve, or even whether Metro was right in its designations. The question is a narrow one: whether Metro considered what the statute[s] and rules require it to consider, and whether Metro's findings explain its reasoning, and *whether there is substantial evidence in the record to support Metro's decision.*"

(Second emphasis in original; first and third emphases added.)

Further, OAR 660-027-0080(4)(a) provides that, in reviewing whether the submittal "compli[es] with the Goal 2 requirement for an adequate factual base," LCDC "shall consider whether the submittal is supported by substantial evidence. Under ORS 183.482(8)(c) substantial evidence exists to support a finding of fact when the record, viewed as a whole, would permit a reasonable person to make that finding[.]" In applying that standard, LCDC noted in its order that,

"[w]here the evidence is conflicting, the factual base is adequate if a reasonable person could reach the decision that Metro and * * * Washington County made in view of *all* the evidence in the record. The choice between conflicting evidence belongs to the decision maker."

(Emphasis in original.)

We readily conclude that LCDC properly articulated the substantial evidence standard of review. Accordingly, to the extent that particular petitioners contend that the order on review is unlawful in substance because LCDC

misapplied its standard of review for substantial evidence, we will affirm unless the evidence is "so at odds" with LCDC's evaluation that we can infer that LCDC "misunderstood or misapplied" the proper standard. *Younger*, 305 Or at 359. With those standards in mind, we turn to petitioners' specific contentions on a county-by-county basis.

## C. *Petitioners' Particularized Challenges*

### 1. *Washington County*

As explained above, 261 Or App at 333, because Washington County misapplied the rural reserve factors, the designation of urban and rural reserves in that county must be remanded. As a prudential matter, given the potential pervasive consequences of the remand, our disposition in that regard obviates the need to consider any of the substantial evidence challenges pertaining to particular properties in Washington County.

### 2. *Clackamas County*

#### a. Designation of Area 4J As Rural Reserve

In his first assignment of error, Maletis contends that LCDC's order is unlawful in substance because it misapplied its substantial evidence standard of review and, as a consequence, approved the designation of his property as rural reserve even though that designation was not supported by substantial evidence.[50] As amplified below, we reject Maletis's contentions pertaining to LCDC's substantial evidence review.

Maletis's property is located in Area 4J, which Clackamas County designated as rural reserve and LCDC described as follows:

"* * * Area 4J is generally flat and comprised of large farms. The Molalla and Pudding Rivers are located in the eastern part of this area. The Willamette, Molalla and Pudding Rivers and their floodplains are identified as important natural landscape features in Metro's February 2007 Natural Landscape Features Inventory. All of this rural reserve is classified as Foundation Agricultural Land (identified in

---

[50] Maletis (unlike Barkers) does not raise a legal challenge to the sufficiency of the county's consideration of the reserve factors.

the ODA Report as part of the Clackamas Prairies and French Prairie areas)."

(Record citations omitted.) According to Maletis, he owns "approximately 385 acres" within Area 4J that is

"located in the French Prairie area south and east of the City of Wilsonville in Clackamas County ('Property'). The Property is generally bordered by lands within the Portland Metro Urban Growth Boundary ('UGB') to the north; Interstate Highway 5 ('I-5'), a rest stop, and a solar field on the west; and Aurora Airport to the south. State Highway 551 bisects the Property and connects directly with I-5. * * * The Property is generally unimproved, although it does include the Langdon Farms Golf Club. The Property is generally flat, although it does not lie within any floodplains. Moreover, the Property does not include any important natural landscape features, such as plant or wildlife habitat or other features that define and distinguish the region. As a result the Property is generally unconstrained and buildable."

(Record citations omitted.)

Before LCDC, Maletis objected to the designation of his property as rural reserve. As noted by LCDC, the gravamen of Maletis's objection was that "substantial evidence in the record supports designating [Maletis's] property 'urban reserve' and conversely does not support the current designation as 'rural reserve.'" In denying that objection, LCDC reasoned:

"After completing a comprehensive analysis of the property and its suitability for urban or rural purposes, Clackamas County found that [A]rea 4J rated 'high' under all of the factors related to long-term protection for agriculture and forest industries. The county also rated the property as having 'medium' or 'high' suitability for an urban reserve designation on all factors, with the exception of three subfactors. Thus, the county found that, based on the factors, it could qualify for either an urban or rural reserve designation.

"[Maletis's] primary contention is that substantial evidence in the record supports designating [his] property 'urban reserve' and conversely does not support the current designation as 'rural reserve.' However, while Maletis

disagrees, as cited above, there is substantial evidence in the record upon the consideration of which Metro and the [c]ounty could reasonably determine that [A]rea 4J should be designated as a rural reserve under the factors in OAR 660-027-0060 in addition to the safe harbor under [OAR 660-027-0060(4)]. Moreover, in the situation where Metro and the county could determine that an area could be either a rural reserve or an urban reserve, based on their consideration of the statutory and rule factors, the decision concerning which designation to apply is highly discretionary. OAR 660-027-0005(2) provides that the purpose of the Metro reserves as a whole is to provide 'a balance in the designation of urban and rural reserves that, in its entirety, best achieves livable communities, the viability and vitality of the agricultural and forest industries and protection of the important natural landscape features that define the region for its residents.' While it is possible that consideration of substantial evidence could support either designation, the applicable statute and rule leave substantial discretion to Metro and the counties as to which designation to make.

"＊＊＊＊＊

"On review of the re-designation submittal Maletis supplemented [his] objections. [Maletis] contend[s] that the county should have made additional findings specific to the Maletis property in isolation and not as to the entirety of rural reserve [A]rea 4J. However, neither the statute nor ＊＊＊ applicable rules require[s] such a parcel-specific evaluation. The county considered the factors for designation of Area 4J as rural reserves under OAR 660-027-0060 and determined that the area was appropriately designated as a rural reserve under the factors. *While Maletis identified conflicting evidence before the county regarding designation as an urban, as opposed to rural reserve, the fact of conflicting evidence does not provide a basis for the Commission to remand the decision. The Commission will not substitute its judgment for that of the county and Metro. Under the substantial evidence standard, where the evidence in the record is conflicting, if a reasonable person could reach the decision that the decision maker made in view of all the evidence in the record, the choice between the conflicting evidence belongs to the decision maker. Mazeski v. Wasco County, 28 Or LUBA 178, 184 (1994), aff'd, 133 Or App 258, 890 P2d 455 (1995). The Commission finds that the county's rural*

*reserve designation of the challenged portion of \* \* \* Area 4J has an adequate factual base and is supported by substantial evidence in the record."*

(Record citations omitted; emphasis added.)

On review, Maletis's primary contention is that LCDC failed to properly engage in substantial evidence review.[51] Specifically, Maletis asserts that

"LCDC wholly failed to identify or consider *any* evidence, let alone *all* of the evidence. For example, LCDC failed to consider reports from the Port of Portland and the Clackamas County Business Alliance explaining how the Property is of unique and economic importance and has high potential for employment growth with comparatively low infrastructure and service delivery costs. Not only has LCDC failed to identify this evidence, LCDC has not considered whether this evidence undermines evidence in the record that supports a rural reserve designation. As such, LCDC has failed to properly apply the 'substantial evidence' test set forth in *Younger*."

(Record citations omitted; emphasis in original.) Relatedly, Maletis contends that LCDC's reasoning is inadequate to respond to its objection because, although LCDC "identified the issue and supplied its legal conclusion," LCDC failed to "reference \* \* \* facts or evidence" and failed to provide a "meaningful explanation of [its] reasoning, other than a reference to Clackamas County's findings (which are not themselves evidentiary)." We disagree with Maletis's contentions.

As we have explained, LCDC properly articulated the substantial evidence standard of review. 261 Or App at 348-50. Further, LCDC acknowledged that Maletis had identified evidence that would support an urban reserve

---

[51] Maletis also raises two additional contentions—*viz.*, that (1) "LCDC failed to identify the applicable legal standard" and, for that reason, "it is not clear that LCDC understood what 'substantial evidence' means"; and (2) "by deferring to the County's 'highly discretionary' decision, LCDC wrongfully permitted Metro and the Counties to conduct a standard-less review of regional lands, resulting in the designation of reserves not based upon policy and planning factors but based upon 'political checks and balances.'" We have previously rejected those contentions. *See* 261 Or App at 348-50 (discussing LCDC's understanding of its substantial evidence review); 261 Or App at 319 (explaining that LCDC fully and correctly understood that designation of urban and rural reserves is not a "political" decision, unconstrained by legal requirements).

designation of his property. Nevertheless, LCDC explained that the existence of that evidence did not, in and of itself, provide a basis for it to remand the decision because,

> "[u]nder the substantial evidence standard, where the evidence in the record is conflicting, if a reasonable person could reach the decision that the decision maker made in view of *all* the evidence in the record, the choice between the conflicting evidence belongs to the decision maker."

(Emphasis in original.) Ultimately, LCDC determined that substantial evidence existed in the record to support a designation of Area 4J generally—and Maletis's property specifically—as rural reserve.

Again, our role is not to review Metro and the counties' submittal for evidentiary support. Instead, we determine whether LCDC understood and applied the substantial evidence standard correctly. *Younger*, 305 Or at 358-59. The gravamen of LCDC's reasoning is that, where, as here, evidence in the record would support either an urban or rural designation, the choice of designation is left to Metro and the counties. In other words, LCDC essentially accepted the fundamental premise underlying Maletis's contentions—*viz.*, that substantial evidence supported the designation of his property as urban reserve. Nevertheless, LCDC explained that, because there was also substantial evidence to support Metro and the county's rural reserve designation, the choice of designation must be made by the local government. Further, as we previously explained, 261 Or App at 306-07, except in circumstances not present here, determinations of relative suitability—that is, determinations that land that is suitable for either urban or rural reserve designation is better suited for one designation over the other—are not required by the pertinent statutes and rules. Under those circumstances, we cannot infer that LCDC "misunderstood or misapplied" the substantial evidence standard of review. *Id.* at 359.

Further, although Maletis would have preferred that LCDC provide a more detailed response to his objection, such a response is not required here. In describing an appellate court's review of a LUBA decision, the Supreme Court in *Younger* explained:

"We also emphasize that LUBA, in its written opinions, need not always address in detail 'whether or not the conflicting evidence rendered the supporting evidence no longer 'substantial,' and why,' as petitioners contend. It would be helpful and desirable for LUBA to do that, but *the function of a reviewing court under ORS 197.850(9)(a) is only to determine whether LUBA has correctly understood and applied the appropriate standard of review. Where a reviewing court can make that determination, there is no obligation upon LUBA to explain itself further.* But we caution that where the evidence in the record is such that it would appear to a reviewing court that LUBA has misunderstood or misapplied ORS 197.835(8)(a)(C), LUBA courts reversal if it does not explain its decision in more detail than a simple statement that it finds, upon consideration of all the evidence in the record, that the local government's decision is or is not supported by substantial evidence."

305 Or at 360 (emphasis added).

Thus, we conclude that LCDC correctly understood and applied the substantial evidence standard of review and that it adequately responded to Maletis's objection that the designation of its property was not supported by substantial evidence. Accordingly, we reject Maletis's first assignment of error.

### b. Designation of Areas 4A to 4D As Urban Reserve

In its second assignment of error, West Linn contends that "LCDC's misinterpretation and misapplication of its legal and evidentiary scope of review resulted in misapplication of the [f]actors and other applicable law" to four urban reserve areas in Clackamas County—*viz.*, Area 4A (Stafford), 4B (Rosement), 4C (Borland), and 4D (Norwood), which West Linn collectively refers to as "Stafford." LCDC described those areas as follows:

"* * * Urban Reserves 4A, 4B and 4C are named Stafford, Rosemont and Borland. These three areas comprise approximately 4,700 acres. Area 4A (Stafford) is located north of the Tualatin River, south of Lake Oswego, and west of West Linn. Area 4B (Rosemont) is a 162-acre area located adjacent to West Linn's recently urbanized Tanner Basin neighborhood. Area 4C (Borland) is located south of the Tualatin River, on both sides of I-205. Area 4C is adjacent

to the cities of Tualatin and Lake Oswego on the west and West Linn on the east. The southern boundary generally is framed by the steeper terrain of Pete's Mountain. There are very few parcels greater than 20 acres. The terrain of this area is varied. Most of [A]rea 4B is gently rolling, while the rest of the area east of Wilson Creek has steeper terrain. The area south of Lake Oswego, along Stafford Rd. and Johnson Rd., generally has more moderate slopes. The Borland area, south of the Tualatin River, also is characterized by moderate slopes.

"Wilson Creek and the Tualatin River are important natural landscape features located in this area. This entire area is identified as Conflicted Agricultural Land, although approximately 1,100 acres near Rosemont Road are zoned Exclusive Farm Use. The Oregon Department of Forestry Development Zone Map does not identify any Mixed Forest/Agriculture or Wildland Forest located with this Urban Reserve.

"Area 4D comprises approximately 2,600 acres, and is adjacent to a slightly smaller urban [r]eserve in Washington County. This area is parcelized, generally developed with a mix of single family homes and smaller farms, and has moderately rolling terrain. All of this area is identified as Conflicted Agricultural Land."

Before LCDC, West Linn objected to the designation of Stafford as urban reserve on a number of grounds. In general terms, West Linn deconstructed the evidence in relation to each of the urban reserve factors and contended that the designation of Stafford as urban reserve did not "comply" with the factors, either individually or collectively, and, thus, that the designation of Stafford as urban reserve is not supported by substantial evidence.

Because it is ultimately dispositive, we focus on LCDC's resolution of West Linn's objections pertaining to the provision of transportation to Stafford. Specifically, West Linn contended that the designation of Stafford as an urban reserve did not demonstrate compliance with OAR 660-027-0050(1) and (3)[52] and was not supported by substantial

---

[52] Again, OAR 660-027-0050 provides, in part:

"When identifying and selecting lands for designation as urban reserves under this division, Metro shall base its decision on consideration of whether

evidence. In particular, West Linn pointed to evidence that demonstrated that,

> "even under the rosiest of financial assumptions[—which included '$13.6 billion in likely available funding and $7 billion to be raised through enactment of/significant increase in state and regional registration fees, the Tri-Met payroll tax, increase in SDC fees, and adoption of a street utility fee by all Metro jurisdictions—]*the [Regional Transportation Plan (RTP)] indicates that almost all of the transportation system that would provide access to the Stafford Area will be functioning at service level F (for 'failing') by 2035.* In other words, Metro's own analysis conclusively demonstrates that urban development of the Stafford Area will not be served at all, let alone adequately or efficiently, by existing or projected transportation investments. It also demonstrates that urban development of the Stafford Area cannot be efficiently and cost-effectively served by transportation infrastructure—in fact, it demonstrates that the money won't be there to fix the problems."[53]

(Footnotes omitted; emphasis added.)

LCDC's response to West Linn's objection began by explaining that

> "Tualatin and West Linn note that they and the City of Lake Oswego have opposed the urbanization of the Stafford Area on the grounds the cities cannot cost-effectively provide public services such as transportation, water, and sewer. If the Stafford Area could be cost-effectively served

---

land proposed for designation as urban reserves, alone or in conjunction with land inside the UGB:

"(1) Can be developed at urban densities in a way that makes efficient use of existing and future public and private infrastructure investments;

"* * * * *

"(3) Can be efficiently and cost-effectively served with public schools and other urban-level public facilities and services by appropriate and financially capable service providers[.]"

Although West Linn's contentions pertaining to the provision of transportation to Stafford point to both factors, we express no opinion as to the scope of their application.

[53] West Linn also raised contentions pertaining to Goal 12 (Transportation) and the Transportation Planning Rule (TPR), OAR chapter 660, division 12. LCDC rejected those contentions. On review, West Linn has also raised contentions pertaining to Goal 12 and the TPR, which we reject without further discussion.

or urbanized without risking significant negative impacts on existing services or the livability of their existing residents, the cities state that they would be in favor of urbanizing the Stafford Area. The cities argue that Metro and Clackamas County should have accorded great weight to the testimony of the cities. Finally, they argue that Metro's findings are not supported by substantial evidence in the record."

Specifically, LCDC noted that "[t]he cities *** assert that the designation does not comply with OAR 660-027-0050(1) or (3) *** or the 2035 [RTP]." As LCDC further explained, the cities

"point out that Metro's findings show that urbanization of the Stafford Basin will require enormous transportation system improvements. Tualatin and West Linn contend that Metro's findings that traffic will be bad everywhere does not excuse the fact that this area cannot be efficiently and cost-effectively served by current or future transportation systems. The cities also point out that no appropriate governmental entity can afford to build the required transportation improvements. The cities also argue that poor transportation capacity everywhere does not justify ignoring the factors, and instead it indicates that Metro and the counties should not designate any of those areas as urban reserves until there is sufficient evidence to indicate that the future transportation system will accommodate the development. Similarly, they argue that the county's findings describing its effort to avoid Foundation Agricultural Land does not address whether transportation facilities are available in other, non-foundation areas.

"* * * * *

"Additionally, and more specific to the cities' objection regarding Areas 4A-D, the Clackamas County record indicates that transportation considerations were weighed when the county and Metro compared candidate urban reserve areas, in accordance with OAR 660-027-0050(1) and (3). Clackamas Co. Record at 704-792, 800-01; Exhibit B to Ordinance [No.] 11-1255 at 30 [(the part of the redesignation submittal containing the reasons that Metro and the counties designated particular areas as urban or rural reserve)]. The supplemental findings further explain

"'Cities [of Tualatin and West Linn] argue that the 2035 Regional Transportation Plan ("RTP") indicates

that much of the transportation infrastructure in the area will be at Level of Service "F" by 2035, and that therefore the Stafford area cannot be served at all. The RTP is a prediction of and plan to address traffic flows for a 25-year period. Conversely, the Reserves Designations are intended to address a 50-year time frame, rather than a 25-year time frame. Metro Rec. 1918. The record reflects that the transportation system will necessarily change in 25 years. In that vein, the "Regional High Capacity Transit System" map identifies a new light rail line in the vicinity of I-205 as the "next phase" of regional priority. *See* ClackCo Rec. 734; 822-8[34].' Exhibit B to Ordinance No. 11-1255 at 30.

"The record demonstrates that transportation facilities costs were considered related to the designation of Areas 4A-D as an urban reserve under the factors 1 and 3, and the Commission finds that Metro had an adequate factual base for its decision under Goal 2. Clackamas Co. Record at 704-792; 800-01; Exhibit B to Ordinance No. 11-1255 at 30. The cities' argument that this area will be expensive to serve appears to be true, based on the record, but that does not compel a conclusion that Metro was required to exclude the area on that basis. *See* Clackamas Co. Record at 1268, 1273 (ODOT Urban Reserve Study Area Analysis rating potential of I-205 to accommodate additional traffic as very low and costly). However, the cost of transportation is one factor that Metro was required to, and did, consider, in conjunction with its consideration of all of the urban reserve factors."

(Third brackets in LCDC's order.)

LCDC then addressed West Linn's objections pertaining to each of the other urban factors. Ultimately, in rejecting West Linn's objection that "the decision to designate the Stafford Area as an urban reserve does not demonstrate that the factors as a whole support designation of the Stafford Area as an Urban Reserve," LCDC reasoned:

"As evaluated above regarding the cities' objections to compliance with each of the urban reserve factors, Metro adequately considered the urban reserve factors in OAR 660-027-0050, and documented that consideration with sufficient evidence and findings. Metro and Clackamas County have made findings relative to each of the factors, alone and in relation to the others, explaining the designation

of the Stafford [Area] as urban reserves. Metro Record at 19-23; Exhibit B to Ordinance No. [11]1255 at 26-31. While the cities disagree with the findings and decision, in fact Metro and the county did evaluate each of the factors. As discussed above, contrary to the cities' implication, the factors are not criteria with [which] Metro must show compliance. Thus, the rules did not require Metro and the county to conduct the type of analytical exercise urged by the cities to establish how to 'achieve' the purposes of each of the individual factors. While the cities disagree with the findings and decision, the findings reflect that Metro weighed and evaluated the factors in making the reserves decision, and the findings and conclusions adopted by Clackamas County and Metro adequately explain * * * how all factors were balanced in reaching the decision.

"For those reasons, and as set forth in more detail above, the Commission finds that Metro and Clackamas County appropriately weighed the factors, and that [the] record includes substantial evidence to support the designation of urban reserve for the Stafford Area under the relevant statutory and rule factors, and there is an adequate factual base for Metro's decision."

On review, West Linn essentially renews its contentions raised before LCDC—*viz.*, that (1) the designation of Stafford as urban reserve did not "comply" with the factors, either individually or collectively, and (2) the designation is not supported by substantial evidence.

West Linn's first contention is unavailing. Although West Linn contends that the designation of Stafford as urban reserve does not comply with the various urban reserve factors, we agree with LCDC that *"compliance"* with the factors is not required. As we explained above, the statutes require that Metro and the counties must base its designation on *"consideration"* of the pertinent reserve factors—and the "factors" themselves are not independent approval criteria such that each factor must be satisfied before a designation may be made. 261 Or App at 298-300. Accordingly, the issue reduces to whether LCDC's order is unlawful in substance because it misapplied its review for substantial evidence.

In that regard, we conclude that LCDC's order is unlawful in substance because the evidence to which West Linn points, indicating that the transportation facilities

serving Stafford will be failing by 2035, is "so at odds" with LCDC's determination that the designation of Stafford as urban reserve is supported by substantial evidence that it gives rise to an inference that LCDC misunderstood its standard of review. *Younger*, 305 Or at 359. Thus, it was incumbent on LCDC to provide a "meaningful explanation" as to why—even in light of that conflicting evidence—the designation of Stafford as urban reserve is supported by substantial evidence. LCDC did not do so.

Here, West Linn pointed to evidence demonstrating that "the RTP indicates that almost all of the transportation system that would provide access to the Stafford Area will be functioning at service level F (for 'failing') by 2035." Again, Metro and the county's findings in the submittal pertaining to that evidence—which LCDC essentially adopted without further explanation—state that the

"'Cities [of Tualatin and West Linn] argue that the 2035 Regional Transportation Plan ("RTP") indicates that much of the transportation infrastructure in the area will be at Level of Service "F" by 2035, and that therefore the Stafford area cannot be served at all. The RTP is a prediction of and plan to address traffic flows for a 25-year period. Conversely, the Reserves Designations are intended to address a 50-year time frame, rather than a 25-year time frame. Metro Rec. 1918. The record reflects that the transportation system will necessarily change in 25 years. In that vein, the "Regional High Capacity Transit System" map identifies a new light rail line in the vicinity of I-205 as the "next phase" of regional priority. *See* ClackCo Rec. 734; 822-8[34].' Exhibit B to Ordinance No. 11-1255 at 30."

(First brackets in LCDC's order.)

In other words—and significantly—Metro and the county do not take issue with the correctness of the evidence to which West Linn points—*viz.*, that the RTP indicates that, by 2035, almost all of the transportation facilities serving Stafford will be failing. Instead, they reason that the evidence is immaterial because (1) the RTP is only a prediction of traffic flows for a 25-year period; (2) the urban reserves planning period extends to 2060, which is 25 years beyond the time frame addressed in the 2035 RTP; and (3) the transportation system will necessarily change (*e.g.*,

a new light rail line in the vicinity of I-205 has been identified as a "'next phase'" of regional priority). Stated simply, Metro and the county's reasoning reduces to nothing more than the proposition that the transportation system will change—and presumably improve—by 2060. However, Metro and the county do not explain, by reference to the evidence in the record, why that is so. Bluntly: Metro and the county's reasoning—which LCDC essentially adopted in resolving the substantial evidence challenge—is impermissibly speculative.

Although the designation of land as urban reserve must be based on consideration of the factors, which requires, among other things, that the factors are weighed and balanced as a whole—and although Metro and the counties need not demonstrate "compliance" with any factor—the provision of adequate transportation facilities is critical to the development of urban areas. Evidence demonstrating that "the RTP indicates that almost all of the transportation system that would provide access to the Stafford Area will be functioning at service level F (for 'failing') by 2035," is weighty, countervailing evidence that is squarely at odds with LCDC's determination that the designation of Stafford as urban reserve is supported by substantial evidence. In its order, LCDC acknowledged the evidence to which West Linn points, but, in response, did nothing more than adopt Metro and the county's speculative reasoning that the transportation system will presumably improve by 2060.

In sum, West Linn has pointed to weighty, countervailing evidence that is squarely at odds with LCDC's determination that the designation of Stafford as urban reserve is supported by substantial evidence, and LCDC has failed to meaningfully explain why—even in light of that conflicting evidence—Metro and the counties' designation of Stafford as urban reserve is supported by substantial evidence. *See Younger*, 305 Or App at 360.

Given that circumstance, we must conclude that LCDC's order is unlawful in substance because LCDC has failed to demonstrate that it adequately reviewed Stafford's urban reserve designation for substantial evidence. Because on remand, LCDC must demonstrate that it properly

reviewed Stafford's designation as urban reserve for substantial evidence, we need not address West Linn's other contentions in its second assignment of error.

### c. Remaining Contentions

Under the legal principles described above, 261 Or App at 347-48, we have considered and reject without discussion MLG's fourth assignment of error, contending that LCDC misapplied its substantial evidence standard of review. We also reject without further discussion Graser-Lindsey's substantial evidence-based contentions in her second assignment of error.

### 3. *Multnomah County*

We have considered and reject without discussion MLG's second assignment of error and Springville's third assignment of error, contending that LCDC misapplied its substantial evidence standard of review.

## IX. CONCLUSION

As we have explained in detail above, we reject many of petitioners' contentions. Among others, we reject petitioners' contentions pertaining to (1) the validity of the division 27 rules; (2) Metro's authority to designate reserves outside of its service district boundary; (3) compliance with the amount of land standard in OAR 660-027-0040(2); and (4) compliance with particular Statewide Planning Goals. We also uphold nine fundamental legal premises underlying LCDC's review of the submittal that concern Metro and the counties' "consideration" and "application" of the reserve factors and the meaning and application of the best achieves standard in OAR 660-027-0005(2). Further, we reject most of petitioners' contentions concerning whether LCDC properly applied the substantial evidence standard of review.

Nevertheless, we conclude that LCDC erred in four respects, including in concluding that it has authority to affirm a local government's decision where its findings are inadequate if the evidence "clearly supports" the decision. 261 Or App at 340 n 44. Further—and most significantly—LCDC's order is erroneous in the following three respects:

*First*, LCDC's order is unlawful in substance to the extent that it approved Washington County's legally impermissible application of the rural reserve factors pertaining to agricultural land. Thus, on remand, LCDC must, in turn, remand Washington County's reserves designation as a whole for reconsideration and remand the submittal to Metro and the counties so that they can ultimately assess whether any new joint designation, in its entirety, satisfies the best achieves standard.

*Second*, LCDC's order is unlawful in substance to the extent that it concluded that Multnomah County's "consideration" of the factors pertaining to the rural reserve designation of Area 9D was legally sufficient. On remand, LCDC must determine the effect of that error on the designations of reserves in Multnomah County in its entirety.

*Third*, LCDC's order is unlawful in substance because LCDC has failed to demonstrate that it adequately reviewed Stafford's urban reserve designation for substantial evidence. On remand, LCDC should meaningfully explain, why—even in light of the evidence that the RTP indicates that, by 2035, almost all of the transportation facilities serving Stafford will be failing—the designation of Stafford as urban reserves is supported by substantial evidence.

Accordingly, because LCDC's order is unlawful in substance in those respects, we reverse and remand the order for further action consistent with the principles expressed in this opinion. ORS 197.651(10)(a) (providing that "[t]he Court of Appeals shall reverse or remand the order only if the court finds the order is[,]" among other things, "[u]nlawful in substance").[54]

Reversed and remanded for further action consistent with the principles expressed in this opinion.

---

[54] We have considered the prevailing party designation and an award of costs. In the unique circumstances of this case, we have for prudential and pragmatic reasons designated petitioners (without differentiation) as the prevailing party and have exercised our discretion not to award costs.